(No. 65657<span></span>

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES SEUFFER, Appellant.

*Opinion filed September 19, 1991.—Rehearing denied December 2, 1991.*

484

486

BILANDIC, HEIPLE and FREEMAN, JJ., took no part.

Randolph N. Stone, Public Defender, of Chicago (Robert P. Isaacson, Assistant Defender, of counsel), and Liliana Dago and Jennifer A. Kuhn, law students, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Kenneth T. McCurry and David P. Gaughan, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, James Seuffer, was convicted of the murders of two persons and of several related felonies. At a separate sentencing hearing, the same jury determined that the defendant was eligible for the death penalty and that there existed no mitigating circum-

stances sufficient to preclude imposition of that sentence. The trial judge accordingly sentenced the defendant to death. The defendant's sentence has been stayed pending direct review by this court. See Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).

The present offenses occurred in the early morning hours of October 2, 1984, at a tavern in Chicago. During that period, the defendant shot and killed two persons, James Cobb and Judith Webster, and held a third person captive. Cobb was the manager of the tavern, and Webster was a patron there. The defendant was employed at the tavern, performing a variety of odd jobs and errands, and was permitted to live on the premises in exchange for his work. The defendant raised a defense of insanity to the charges, and at trial the parties presented conflicting testimony on the defendant's mental condition during the relevant time. The State also introduced the testimony of several occurrence witnesses, and evidence of the defendant's confessions.

The chief occurrence witness at the defendant's trial was Catherine Sekerka. Sekerka was employed at the tavern as a bartender, and she was working there at the time of the occurrence charged here. In her testimony, Sekerka described the events surrounding the defendant's commission of the two murders. According to Sekerka, around 11 p.m. on October 1, the defendant broke up an argument between two patrons. Sekerka later heard the defendant complain to manager James Cobb that he felt unappreciated. Sekerka announced last call in the tavern around 1:45 a.m., and the defendant then told one of the regular customers, Judy Webster, to hurry. Later, Sekerka saw that the defendant was holding a shotgun. Cobb told the defendant that the gun was not loaded. According to Sekerka, the defendant fired the gun at Cobb from a distance of five feet, and Cobb fell to the floor. The defendant told Sekerka to summon

paramedics. Before Sekerka could do so, however, the defendant gave her a different number to call instead. Sekerka dialed the number and, when the call was answered, recognized the voice of Kathy Mazer, a co-worker. Sekerka testified that the defendant took the telephone receiver from her and told Mazer that he had just shot his best friend.

At the defendant's order, Sekerka later extinguished the lights in the tavern, and she sat with Judy Webster on the floor. During this time Webster was arguing with the defendant and crying. At one point, the defendant hit Webster in the face with the shotgun. After further argument between the defendant and Webster, the defendant shot Webster in the face from a distance of about four feet. Afterwards, he shined a flashlight on Webster's face and commented that no one would be able to recognize her. Sometime after daybreak, the defendant fell asleep, and Sekerka was able to escape from the building around 8:30 or 8:45 that morning. Sekerka testified that the defendant did not appear to be intoxicated during the period he held her captive.

Katherine Mazer spoke with the defendant on the telephone several times while he was in the tavern, and at trial she described the contents of the calls. Mazer testified that she received the first telephone call from the defendant between 2 and 2:10 a.m. on October 2. Annoyed at being awakened by the call, Mazer told the defendant not to bother her and then hung up. A short time later, Mazer received a call from Cathy Sekerka. The defendant then got on the line and told Mazer that he had killed James Cobb and that he was holding two other persons hostage. The defendant asked Mazer to come to the tavern. After the call was completed, Mazer notified the police. Officers set up a command post at a restaurant near the tavern and established communication with the defendant over the telephone.

From the restaurant, Mazer spoke with the defendant several more times during the incident. According to Mazer, in these conversations the defendant blamed her for what he had done and declared that he would release Sekerka and Webster if she would come to the tavern. At trial, Mazer explained that about a week before the occurrence charged here, she had given the defendant a quantity of marijuana for him to roll into cigarette form and that the defendant had failed to return the marijuana to her. Mazer said that the defendant spoke in complete sentences during their conversations and that she had no difficulty understanding him.

Shortly after Sekerka escaped from the tavern, police officers entered the building and arrested the defendant. Following his arrest, the defendant made two separate statements concerning the present offenses. The defendant made an initial, oral statement around 11 o'clock that morning. In the statement, the defendant told a police officer that he had been upset because Mazer had accused him of stealing marijuana from her and had complained to others that he was a thief. The defendant stated that after speaking with Mazer on the telephone, he resolved to "get" her. He then obtained a shotgun that was kept on the premises. According to the defendant, the gun discharged as Cobb attempted to persuade him to surrender the weapon. The defendant also said that he later hit Judy Webster in the face with the gun and shot her.

On the afternoon following his arrest, the defendant provided authorities with a second, more detailed account of the offenses. The defendant did not wish to have the statement recorded by a stenographer, so an assistant State's Attorney instead drafted a summary of the defendant's remarks. Afterwards, the defendant reviewed the written statement, made several corrections to it, and signed it. In the signed statement, the defend-

ant said that he telephoned Kathy Mazer around 2 a.m., when the tavern closed. Apart from the defendant, the only persons on the premises at that time were James Cobb, Cathy Sekerka, and Judy Webster. Mazer hung up on the defendant, so he decided to go to her apartment, which was located nearby. The defendant then retrieved a shotgun that was kept in a storage room at the tavern. Cobb said that the gun was not loaded and told the defendant to put it down. The defendant said that he pumped the gun and found that it was loaded. As Cobb reached for the barrel, the defendant pulled the weapon away. According to the defendant, the gun then discharged. Afterwards, the defendant spoke with Mazer again on the telephone and blamed her for Cobb's death. The defendant said that he did not remember putting another shell in the gun but that he did recall hearing a loud noise just after he shot Webster.

The sole defense witness at trial was Dr. Frank Lorimer, who testified in support of the defendant's claim of insanity. Dr. Lorimer was a board-certified psychiatrist and, before his retirement from active practice in 1980, had been employed as a consulting psychiatrist by the Illinois Department of Corrections and by the Psychiatric Institute of Cook County. Dr. Lorimer testified that the defendant was insane at the time of his commission of the offenses charged here. Specifically, Dr. Lorimer believed that the defendant was suffering from an organic mental disorder during that period. In Dr. Lorimer's view, the defendant was able neither to appreciate the criminality of his actions nor to conform his conduct to the requirements of law. Dr. Lorimer further stated that the defendant's condition had two diagnostic subcategories: amnestic disorder and delirium tremens.

Dr. Lorimer based his diagnosis on several interviews he conducted with the defendant, on an analysis of various medical records and test results, and on a review of

pertinent police reports. Dr. Lorimer stated that an electroencephalogram (EEG) indicated "exceedingly fast" activity in the defendant's brain, a circumstance that the witness regarded as abnormal. Dr. Lorimer acknowledged that no abnormalities had been revealed by psychological tests administered to the defendant, or by two other diagnostic tools, computerized axial tomography (CAT scan) and magnetic resonance imaging (MRI test). According to Dr. Lorimer, the defendant said that he had consumed a large amount of alcohol in the hours immediately preceding his commission of the present offenses. The defendant also told Dr. Lorimer that on several occasions he had attempted to take his own life.

On cross-examination, Dr. Lorimer conceded that he had failed to discover any evidence of head injury to the defendant, though, he acknowledged, that evidence is found in 80% to 90% of cases of organic mental disorder. Separately, Dr. Lorimer stated on cross-examination that he had also made a neurological, as distinguished from a psychiatric, diagnosis of the defendant, concluding that the defendant had limbic epilepsy. Dr. Lorimer averred that this additional finding provided support for, but was not essential to, his primary diagnosis of organic mental disorder. Dr. Lorimer believed that the defendant was experiencing a rage attack when he committed the present offenses, and explained that such an attack is a form of seizure that may occur in cases of limbic epilepsy. Dr. Lorimer acknowledged that limbic epilepsy has not gained official recognition from the medical community.

In rebuttal, the prosecution presented testimony contradicting Dr. Lorimer's conclusions that the defendant was insane. One of the State's rebuttal witnesses was Dr. Robert A. Reifman, a physician and board-certified psychiatrist, and director of the Psychiatric Institute of Cook County. From an examination of the defendant and

a review of the pertinent records, Dr. Reifman concluded that the defendant could both appreciate the criminality of his conduct and conform his actions to the requirements of law, and therefore that the defendant was legally sane. Dr. Reifman believed that the defendant had a borderline personality, which the witness characterized as a severe personality disorder. Dr. Reifman stated that the defendant's behavior at the time of his commission of the present offenses appeared to be goal-directed and free of psychosis. Dr. Reifman also believed that the defendant's accounts of his actions during that period were inconsistent with any later claim of amnesia. On cross-examination, Dr. Reifman stated that at the time of the offenses the defendant was mentally ill, as that term is defined by statute (see Ill. Rev. Stat. 1985, ch. 38, par. 6—2(d)), as distinct from being insane, an affirmative defense. Judging from the drugs previously prescribed for the defendant, Dr. Reifman also stated on cross-examination that the defendant apparently had a form of epilepsy.

Also testifying as a rebuttal witness in behalf of the State was Dr. John R. Hughes, a physician and professor of neurology at the University of Illinois Medical Center, and a specialist in epilepsy and electroencephalography. Dr. Hughes had reviewed the pertinent medical records but had not examined the defendant. Dr. Hughes stated that Dr. Lorimer is the only practitioner he is aware of who considers "exceedingly fast" brain activity, as found in an EEG, to be abnormal, or who sees a relationship between exceedingly fast brain activity and rage attacks. Also, Dr. Hughes disputed Dr. Lorimer's conclusion that the defendant was experiencing a seizure-related rage attack at the time of the offenses charged here. Dr. Hughes explained that a rage attack is not an epileptic seizure. In addition, Dr. Hughes stated that the notion that the defendant was undergoing a limbic epileptic sei-

zure at the time of the present offenses was contradicted by the defendant's purposeful activity during the same period. Dr. Hughes explained that a person who was experiencing a seizure would not be able to use a telephone, fire a gun, or perform any of the other volitional acts that the defendant acknowledged performing during the time in question.

At the close of evidence, the jury found the defendant guilty of the murder of James Cobb and Judith Webster, guilty of the forcible detention of Webster and Cathy Sekerka, and guilty of the unlawful restraint of Webster and Sekerka. Judgment was entered on the jury's verdicts. At the State's request, a separate sentencing hearing was then held to determine whether the defendant should be sentenced to death for the murder convictions. At the first stage of a bifurcated sentencing hearing, the State introduced evidence of the defendant's convictions in the present case. The State alleged the existence of two statutory aggravating circumstances that would render the defendant eligible for the death penalty: his commission of multiple murders, and the occurrence of the murder of Judith Webster in the course of a specified felony, forcible detention (see Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b)(3), (b)(6)). In addition, the parties stipulated that the defendant was born on April 4, 1957, and thus had attained the age of 18 at the time of the present offenses. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b).) Following deliberations, the jury unanimously found the existence of one of the statutory aggravating circumstances alleged by the prosecution, occurrence of murder in the course of another felony, forcible detention; the jury was unable to unanimously find the existence of the multiple-murder aggravating circumstance, which at that time required that the deaths have been "the result of either an intent to kill more than one person or of sepa-

rate premeditated acts" (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)).

During the second stage of the sentencing hearing, the State introduced evidence of the defendant's prior convictions, in February 1980, on charges of voluntary manslaughter and armed violence. According to the evidence presented, the defendant had shot and killed a male roommate during an argument. The defendant was sentenced to four years' imprisonment for the offenses.

A number of family members and friends testified in the defendant's behalf at the second stage of the sentencing hearing. The witnesses provided information about the defendant's troubled childhood and favorable testimony concerning his adjustment to prison life following his prior convictions. Several of the defendant's drawings were introduced into evidence, as were articles written by the defendant that had been published in a prison newspaper.

Defense counsel also presented the testimony of two expert witnesses in an effort to establish the existence of a statutory mitigating circumstance. Dr. Robert Reifman, who had appeared in the State's behalf at the guilt-innocence stage of the proceedings, and Dr. Michael Rabin, senior staff psychologist at the Psychiatric Institute, believed that the defendant was suffering from borderline personality disorder. Dr. Rabin's secondary diagnosis was alcohol dependence. Both witnesses stated that, in their opinions, the defendant was acting under the influence of an extreme mental or emotional disturbance at the time of his offenses, a mitigating circumstance under the death penalty statute (see Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2)).

The defendant also testified in his own behalf at the sentencing hearing. Describing the events charged here, the defendant stated that he was drinking heavily during the hours preceding his commission of the present of-

fenses. The defendant said that he telephoned Kathy Mazer around 2 a.m. to discuss her accusation that he had stolen marijuana from her. The defendant explained at the sentencing hearing that he became angry when Mazer refused to speak with him. The defendant testified that he did not remember much that happened after that, though he recalled being awakened by police officers later that morning. The defendant expressed remorse for the deaths of James Cobb and Judith Webster.

At the conclusion of its deliberations, the jury returned a verdict imposing the death penalty for the murder of Judith Webster. Judgment was entered on the jury's verdict. The defendant was not sentenced on the remaining convictions.

## I

The defendant raises a number of allegations of error concerning the guilt-innocence and sentencing phases of the proceedings. For purposes of our review, we shall discuss these issues in the sequence in which the errors allegedly occurred. The defendant's first group of arguments involves jury selection.

Prior to *voir dire*, defense counsel asked that each of the prospective jurors be examined separately, apart from the remainder of the venire. The trial judge denied the defendant's request for a sequestered *voir dire*, stating that the procedure was unnecessary in the present case. Before this court, the defendant argues that the trial judge committed reversible error in refusing to conduct the *voir dire* in the manner urged. Citing this court's description of the insanity defense as a matter "known to be subject to bias or prejudice" (*People v. Bowel* (1986), 111 Ill. 2d 58, 65), the defendant contends that a sequestered *voir dire* would have been especially appropriate in the present case because the issues involved were controversial.

"The purpose of *voir dire* is to assure the selection of an impartial panel of jurors who are free from bias or prejudice. [Citations.]" (*Kingston v. Turner* (1987), 115 Ill. 2d 445, 464.) Having reviewed the complete record in this case, we cannot say that the trial judge's refusal to conduct a sequestered *voir dire* threatened the fulfillment of that purpose. The trial judge examined the prospective jurors individually, exploring in detail each person's attitudes toward the insanity defense, as well as other matters germane to the present case. The trial judge excluded from service those persons whose backgrounds or views might have interfered with their impartial consideration of the evidence. The defendant makes no contention that any of the specific persons who actually served on the jury were other than impartial with respect to any issue in the case, including the insanity defense. We do not believe that the judge abused his discretion in denying the defendant's request that he conduct a sequestered *voir dire*. See *People v. Neal* (1985), 111 Ill. 2d 180, 197-98; *People v. Newbury* (1972), 53 Ill. 2d 228, 241.

In a related argument, the defendant contends that the trial judge erred in refusing to declare a mistrial in the course of jury selection. Defense counsel moved for a mistrial on several occasions during *voir dire*, in the wake of remarks by a number of prospective jurors critical of the insanity defense. Asked about their views toward the insanity defense, different prospective jurors commented that the defense was "slightly overused," "worn thin," "overused," and "abused"; another person declared that she did not "believe in it." The defendant contends that these negative comments might have tainted the entire venire, including those persons who were ultimately selected to serve as jurors in the case at bar.

The defendant's concern is entirely speculative. The trial judge questioned 67 persons in the course of selecting a jury. Of the 67 persons examined, a total of 12 either made comments that were critical of the insanity defense—their comments are quoted above—or said simply that their views on the defense would prevent them from being impartial, without offering characterizations of their opinions. We note that the defendant has also cited the comments of a thirteenth person, who described the insanity defense as "an excuse." Viewing that individual's remark in context, however, we consider that the person meant only that insanity could perhaps constitute a valid "excuse," or defense, to a criminal charge.

The trial judge questioned each member of the venire carefully and at length. As we have stated, there is no indication in the record that the jury empaneled in the present case was biased in any respect. It cannot be said that the trial judge erred in refusing to declare a mistrial when several persons expressed skepticism regarding the insanity defense. We note that none of the 13 prospective jurors whose views have been cited served on the defendant's jury. Ten were excluded by the court for cause, one was excused by the State, and two—discussed below—were excused by the defendant.

The defendant next contends that two prospective jurors should have been excluded for cause because of their views toward the insanity defense. Both prospective jurors initially expressed the opinion that the insanity defense was overused; their comments are noted in the preceding discussion. The defendant asked the trial judge to exclude the two prospective jurors for cause. When the judge declined to do so, defense counsel exercised peremptory challenges against them. The defendant eventually exhausted his allotment of peremptory

challenges, and the trial judge denied the defendant's requests for additional challenges.

The determination whether to allow a challenge for cause is committed to the sound discretion of the trial court. (*People v. Hyche* (1979), 77 Ill. 2d 229, 239.) From our review of the transcript of the *voir dire,* we conclude that the trial judge did not abuse his discretion in declining to excuse the two prospective jurors for cause. Asked whether he held any particular views regarding the insanity defense, prospective juror Fabbri replied, "Other than the fact that it might be used much too often." In response to further questioning from the court, however, Fabbri said that he would be willing to listen to the evidence presented and, furthermore, that he would "definitely" be able to consider the testimony of a psychiatrist or psychologist. Responding to a similar inquiry, prospective juror Gabriel expressed the opinion that the insanity defense has been "overused." She went on to explain, though, that her viewpoint would not prevent her from considering the testimony of a psychiatrist or psychologist. Although the trial judge did not also ask the two prospective jurors whether they would be able to set aside their views if selected, we do not consider that the failure to ask that question deprived the trial judge of a reasoned basis for deciding whether to excuse the two for cause. Indeed, their responses during *voir dire* were essentially no different from those of another prospective juror, discussed later in this opinion, who was, as the defendant asserts, improperly excluded for cause.

The defendant also contends that during *voir dire* the trial judge made a remark critical of the insanity defense, telling the prospective jurors that he believed that the defense was overused. The defendant submits that the judge's lack of impartiality tainted the venire. In support of this argument, the defendant directs our at-

tention to the following exchange between the trial judge and prospective juror Gabriel:

"Q. Do you have any feelings or viewpoints concerning the defense of insanity?

A. Yeah, it's overused.

Q. You think it's overused. Well, the question is[,] a defense of insanity will be presented in this case and a psychiatrist or psychologist will testify, probably more than one. Will you be able to listen to that testimony and use it in assessing the defense of insanity?

A. Yes.

Q. It may be overused but that [in] itself isn't going to prevent you from listening to it, is it?

A. No."

The defendant asserts that the trial judge's remark, "It may be overused," was an expression of the judge's own view regarding the insanity defense. We do not agree. We note that when the same contention was raised by defendant's trial counsel during *voir dire*, counsel, after reviewing the court reporter's notes, apparently agreed with the judge that the comment was not an expression of personal opinion. From the transcript, it is clear that the trial judge was merely restating and paraphrasing the prospective juror's prior remark for the purpose of making further inquiry into her views toward the insanity defense. Read in context, the court's comment was proper.

The prospective jurors were "death qualified," and the defendant contends that one of the members of the venire was erroneously excluded for cause on the basis of the person's views toward capital punishment. The defendant argues that the prospective juror did not express a disqualifying view on that issue and that his removal for cause was therefore erroneous.

Following the trial court's examination of prospective juror Katz, the prosecutor asked that the venireman be excused for cause, citing his views on capital punishment

and on the insanity defense. Over the defendant's objection, the trial judge granted the State's motion and removed the prospective juror for cause. Although the prosecutor had offered two separate, independent grounds for exclusion, the judge did not specify a basis for his ruling. Before this court, the State renews its argument that the prospective juror expressed disqualifying views toward both the death penalty and the insanity defense. From our examination of the record, we conclude that removal for cause was not warranted on either ground.

We first consider whether the prospective juror's exclusion was warranted by his attitudes toward capital punishment. With respect to that issue, the trial court made the following inquiry:

"Q. Mr. Katz, do you have any scruples or feelings by reason of religion or conscious [*sic*] against the death penalty?

A. Yes.

Q. Do you have any scruples against the death penalty no matter what the particular outcome might be?

A. I don't think so.

Q. In other words—

A. My position is philosophic and part medical, not religious or conscious [*sic*].

Q. Let me just continue with these questions. Would your scruples against the death penalty interfere with or affect your ability to determine the guilt or the innocence of a defendant in accordance with the evidence and the law?

A. No.

Q. If the defendant is found guilty of the charges before the court, could you consider all possible penalties available under the law including the death penalty or any lesser penalty?

A. Depending on the circumstances, I believe.

Q. Let me ask you this then. Would your scruples prevent you from considering the death penalty in an appropriate case?

A. No.

Q. So would you automatically vote against the death penalty no matter what the facts of the case reveal?

A. No."

We do not agree with the State that the prospective juror's views on capital punishment warranted his removal for cause. A member of the venire may not be excluded from jury service simply because the person "voice[s] general objections to the death penalty or expresse[s] conscientious or religious scruples against its infliction." (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777-78.) In determining whether a prospective juror may be removed for cause because of the person's views toward the death penalty, the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526.) We do not believe that removal for cause was warranted in this case. In the case at bar, the prospective juror initially expressed opposition to capital punishment. Under further questioning, however, he stated unequivocally that his views would not affect his determination of the defendant's guilt or innocence and, moreover, would not prevent him from considering the death sentence in an appropriate case. On this record, we conclude that the prospective juror, though philosophically opposed to capital punishment, did not express a disqualifying view.

In the alternative, the State contends that the removal of the prospective juror may be sustained on the

second, independent ground offered by the prosecutor in challenging the person for cause—his views toward the insanity defense. We do not agree. A review of the individual's responses on the issue demonstrates that his exclusion was not warranted on that ground.

During *voir dire*, the trial judge made the following lengthy inquiry concerning prospective juror Katz's views regarding the insanity defense:

"Q. Do you have any feelings or viewpoints considering the defense of insanity in a criminal case?

A. Yes, I think it's been abused.

Q. Is that going to affect your ability to be a juror in this case? In other words, would you be able to consider—yes or no basis, able to consider the testimony of a psychiatrist or psychologist in assessing the insanity defense?

A. Yes.

Q. You could consider it?

A. Yes.

Q. I would ask you in this case can you consider it? I mean you haven't heard the testimony?

A. Right.

Q. But you're going to have psychiatrists testify. Will you consider their testimony in arriving at your decision in assessing the defense of insanity without too much comment?

A. Yes, I had some in my professional work [*i.e.*, as a school principal]. I dealt with psychiatrists and psychologists.

Q. I don't want to go into too long of a conversation.

A. I think the answer is yes and I understand your question.

Q. But you do have feelings or viewpoints concerning the defense of insanity in a criminal case?

A. Yes.

Q. Is that viewpoint or feeling going to affect your ability to be fair and impartial in this case taking into consideration that this is an insanity defense and there is going to be psychiatrists and psychologists testifying. Is

that going to affect your ability to be totally fair and impartial?

A. I would hope not.

Q. But do you know so? If you're not certain you're not certain.

A. Again if I may just comment, it would take some convincing. I mean I'm not bowled over by titles or anything else.

Q. All right. Can you think of any other reason why you couldn't be a fair and impartial juror in this case?

A. No."

The State argues that the prospective juror's exclusion was warranted on the separate ground that he was opposed to the insanity defense. As a preliminary matter, the defendant maintains that the State cannot seek to sustain the judge's ruling on this theory, for any assumed bias by the venireman in this regard would have only redounded to the benefit of the prosecution. The defendant's contention is without merit. "The purpose of the *voir dire* examination is to assure the selection of an impartial jury" (*People v. Bowel* (1986), 111 Ill. 2d 58, 64), and a trial judge "is obliged to insure that, in fact, the defendant receives a trial before a fair and impartial jury" (*People v. Taylor* (1984), 101 Ill. 2d 377, 387). The prosecutor is not required to stand idly by, but rather may act to prevent the occurrence of error in the record. Accordingly, it is proper, both in the circuit court and on review, for the State to offer the venireman's views on the insanity defense as a reason justifying his removal for cause.

Turning to the merits of the State's argument, we do not believe that the prospective juror possessed a disqualifying view toward the insanity defense. Although the venireman initially expressed disapproval of the defense, commenting that it has "been abused," he later stated repeatedly that he would be able to consider the testimony of expert witnesses in assessing the claim.

Asked yet again whether his view toward the insanity defense would affect his ability to be impartial, the prospective juror replied that he "would hope not." In that way, the venireman was consciously resolving that his opinion on insanity would not influence his deliberations if he were selected as a juror in the present case. And given the prospective juror's earlier responses, we consider his later comments, that it "would take some convincing" and that he was not "bowled over by titles," to mean only that he would not automatically or blindly adopt the testimony of expert witnesses in assessing the claim. Accordingly, we conclude that the removal of Katz cannot be sustained on the alternative ground that he possessed a disqualifying view toward the insanity defense.

The erroneous exclusion of a prospective juror because of the person's views regarding capital punishment, though it will not vitiate the jury's determination of guilt, will necessitate a new sentencing hearing. (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 522 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21; see *People v. Holman* (1984), 103 Ill. 2d 133, 153-54, 178.) Because prospective juror Katz was not properly excludable for cause under the standard prescribed by *Wainwright v. Witt* (1985), 469 U.S. 412, 83 L. Ed. 2d 841, 105 S. Ct. 844, and *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521, we conclude that the defendant in the present case is entitled to a new sentencing hearing. We shall consider below the defendant's remaining challenges to the guilt-innocence phase of the proceedings.

## II

We next address the defendant's claims of evidentiary errors during the guilt-innocence phase of the proceedings. The defendant first contends that the State was

improperly allowed to introduce into evidence a photograph depicting him holding a firearm. The defendant asserts that the photograph was irrelevant to the issues raised at trial and that its admission into evidence was unduly prejudicial.

The photograph in question was found on the defendant at the time of his arrest in the present case. In the photograph, the defendant is sitting in a chair, supporting a shotgun or rifle with one hand and holding a beverage can in the other hand; the butt of the gun is resting on the seat of the chair. There is nothing remarkable about either the background of the photograph, which was taken indoors, or the defendant's expression or dress. The trial judge initially granted a defense motion *in limine* barring introduction of the photograph into evidence. During trial, however, the judge changed that ruling in response to certain testimony elicited by the defendant. Defense counsel cross-examined a police officer on the ease with which the trigger of the murder weapon could be pulled. The State then offered the photograph as evidence of the defendant's familiarity with firearms. The trial judge allowed it into evidence, agreeing with the State that the photograph had become relevant in the case.

Evidence is relevant if it tends " 'to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " (*People v. Monroe* (1977), 66 Ill. 2d 317, 322, quoting Fed. R. Evid. 401.) Relevant evidence may be excluded if its probative value is substantially outweighed by its prejudicial effect. (*People v. Eyler* (1989), 133 Ill. 2d 173, 218.) That determination is committed to the discretion of the trial judge and will not be overturned on appeal in the absence of an abuse of discretion. *People v. Shum* (1987), 117 Ill. 2d 317, 353.

We do not believe that the trial judge abused his discretion in allowing the prosecution to introduce the photograph into evidence. In cross-examining one of the State's witnesses, defense counsel attempted to show that the trigger on the shotgun was easily pulled. The clear import of that inquiry was to suggest that the gun might have discharged accidentally, and that the defendant's firing of the weapon might have been unintentional. In these circumstances, we cannot say that the trial judge abused his discretion in admitting the challenged photograph on the ground that it provided some evidence of the defendant's familiarity with guns and thus tended to rebut defense counsel's suggestion that the gun involved here was discharged accidentally.

We must also reject the defendant's related contention that the trial judge erroneously believed that he had no discretion in the matter and was required to admit the photograph into evidence. Viewed in context, the remarks cited by the defendant in support of this argument—"I can't possibly prevent them from putting that picture into evidence" and "There is no way I could keep that out"—simply express the judge's belief that the defendant had opened the door wide to the introduction of this evidence.

The defendant next challenges the introduction into evidence of three photographs taken of the murder scene. Two of the contested photographs show Judy Webster's body on the floor of the tavern; Webster had been shot in the face, and the photographs depict blood in the area of her wounds. The third challenged photograph is of a large pool of blood on the tavern floor. The defendant maintains that the probative value of these photographs was outweighed by their prejudicial effect and that the admission of the exhibits was therefore error.

The admission of evidence of that nature lies within the discretion of the trial court. (*People v. Shum* (1987), 117 Ill. 2d 317, 353; *People v. Foster* (1979), 76 Ill. 2d 365, 375-78.) Relevant photographs may be introduced into evidence even though they are also gruesome. (*People v. Lucas* (1989), 132 Ill. 2d 399, 438-39; *People v. Lindgren* (1980), 79 Ill. 2d 129, 143-44.) In the present case, the challenged photographs provided evidence of the nature and extent of the injuries inflicted by the defendant during his commission of the present offenses. We conclude that the exhibits were properly admitted into evidence.

## III

In his next series of arguments, the defendant challenges certain comments made by the prosecution in closing argument at the guilt-innocence phase of the proceedings. The trial judge overruled many of defense counsel's contemporaneous objections to the remarks. As a general principle, "[t]he character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge *** properly exercised the discretion vested in him." (*People v. Smothers* (1973), 55 Ill. 2d 172, 176.) Reversal is not warranted unless the reviewing court is able to conclude that the improper comment engendered substantial prejudice. *People v. Collins* (1985), 106 Ill. 2d 237, 276.

The defendant first contends that the prosecutor repeatedly accused defense counsel of having engaged in misconduct at trial. The defendant cites nine instances during rebuttal argument when the prosecution asserted that the defendant was relying on a "confusion defense." For example, the prosecutor stated:

"The principal defense in this case is called the confusion defense. The confusion defense is when the defense throws as many defenses—

[Defense counsel]: Objection, your Honor.

[Assistant State's Attorney]: As many issues as possible.

THE COURT: Overruled, at this point.

[Assistant State's Attorney]: That's what you have right now. This case is not complex as the defense attorneys want you to believe.

They want you to go and argue over a side issue.

[Defense counsel]: Objection.

THE COURT: Overruled."

In subsequent remarks, the prosecutor continued to assert that the defense had presented a variety of subsidiary issues and had sought to raise from those divergent claims a "confusion defense." Defense counsel objected to the majority of those comments; the trial judge overruled the defense objections.

Having considered the challenged remarks in the context of the proceedings, we conclude that the prosecutor's description of the defendant's presentation as a "confusion defense" was within the bounds of proper argument. At trial, the defendant pursued a number of different theories of innocence and extenuation. In his principal theory, the defendant maintained that he was insane during the commission of the offenses charged here. Apart from insanity, however, the defendant presented several alternative theories of defense. Thus, the defendant contended that the shooting of James Cobb was no more than reckless and that the gravest conviction that could be returned for that homicide was involuntary manslaughter. The jury received appropriate instructions and verdict forms reflecting that theory. In addition, during cross-examination of the pathologist who had conducted autopsies of the murder victims, defense counsel elicited certain details of the victims' medi-

cal conditions, including the amount of alcohol found in their blood. Finally, in what must be considered an effort to suggest yet another defense—that the killings were accidental—counsel attempted to elicit testimony from a prosecution witness that the trigger of the shotgun could be manipulated easily. Given the sheer variety of the alternative theories offered by the defendant, we cannot say that the prosecutor's characterization of them exceeded the bounds of proper argument.

The defendant next contends that the prosecutor, in rebuttal argument, improperly accused defense counsel of attempting to denigrate the memories of the two murder victims. As we have noted, defense counsel cross-examined the pathologist concerning certain aspects of the decedents' medical conditions, including the amount of alcohol in their bloodstreams. Alluding to that cross-examination, the prosecutor told the jury that the defense attorney had attempted "to somehow diminish the value of James Cobb's and Judith Webster's life" in hopes of obtaining a favorable verdict for his client. The trial judge overruled the defendant's objection to the comment.

Before this court, the defendant insists that the cross-examination of the pathologist was intended to elicit information of extensive drinking that occurred on the premises during the night of the murders. The defendant further suggests in his brief that Judy Webster's physical condition "could have contributed to her panic which led to her shooting." Notwithstanding those suggested grounds of relevance, we do not consider that the prosecutor's comment was improper. The victims' medical conditions and their consumption of alcohol at the tavern were irrelevant to the defendant's claim of insanity, and irrelevant also to the defendant's further suggestions that the shootings were reckless or were accidental. The prosecution had the right to comment on defense coun-

sel's attempt to show otherwise, and we find no error in the remark that was made.

The defendant next contends that the prosecutor improperly argued to the jury that the decision to charge the defendant with James Cobb's murder was a rejection by the prosecution of the defendant's claim that he did not shoot Cobb intentionally. During the prosecutor's rebuttal argument the following colloquy ensued:

> "Well we know that Seuffer already tried the accident. That didn't work. He got charged.
>
> [Defense counsel]: Objection.
>
> [Assistant State's Attorney]: He got charged—
>
> THE COURT: Overruled."

The prosecutor made the challenged remark in the course of describing the defendant's changing theories of defense. The defendant initially told investigators that the shooting of Cobb was accidental. Later, however, after being charged with the present offenses, the defendant changed his account and insisted that he was unable to recall many details of the occurrence. Assessing the prosecutor's comment in the context in which it was made (see *People v. Turner* (1989), 128 Ill. 2d 540, 561), we consider that the remark is more accurately viewed as a comment on the evolving nature of the defendant's version of events than as an improper attempt by the prosecutor to vouch for the strength of the evidence against the defendant.

In a final series of challenges to the prosecution's closing argument at the guilt-innocence phase of the proceedings, the defendant complains of several comments concerning the expert testimony introduced at trial. The defendant asserts that the prosecutor misstated some of the testimony, incorrectly described the effect under Illinois law of a verdict of guilty but mentally ill, and denigrated the expert witnesses. In argument, the prosecutor provided the following summary of the testimony of

Dr. Frank Lorimer, the defendant's expert witness at trial:

> "Then you have Dr. Lorimer's limbic epilepsy. A position in the medical world only held by Dr. Lorimer.
>
> That's the basis of his organic mental disorder. There's no basis for it.
>
> [Defense counsel]: Objection. That's not the evidence.
>
> THE COURT: The jury heard the evidence, all the testimony. I am sure they will recall. Overruled."

The defendant contends that the prosecutor misstated Dr. Lorimer's testimony. At trial, Dr. Lorimer acknowledged that few, if any, other experts in his field of study recognized limbic epilepsy as a distinct condition. Dr. Lorimer testified, however, that his primary diagnosis—that the defendant was suffering from an organic mental disorder—was not dependent on his separate conclusion that the defendant was also afflicted with limbic epilepsy. Thus, contrary to the prosecutor's statement, limbic epilepsy provided a basis for Dr. Lorimer's primary diagnosis, but it did not constitute the sole ground for that diagnosis.

We do not believe that the prosecutor's erroneous remark denied the defendant a fair trial. Although the trial judge overruled the defendant's objection, the judge also alluded to the jury's role as fact finder, reminding the jurors that they had heard the evidence in the case. It was the function of the jury, in its capacity as trier of fact, to judge the credibility of the witnesses, to weigh the conflicting evidence, and to determine the facts at issue. In addition, the jurors received the standard instruction advising them that the parties' opening statements and closing arguments did not constitute evidence in the case. (See Illinois Pattern Jury Instructions, Criminal, No. 1.03 (2d ed. 1981).) In the circumstances here, we do not believe that the prosecutor's brief comment was prejudicial.

The defendant next argues that during rebuttal argument the prosecutor twice misrepresented to the jury the effect under Illinois law of a verdict of guilty but mentally ill (GBMI). On the first occasion the prosecutor stated, " 'Well okay, you don't buy Doctor Lorimer. Let's at least say he's mentally ill so he can avoid some of the responsibility of his actions.' " Later, the prosecutor said, "Guilty but mentally ill. That, ladies and gentlemen, is a compromise verdict to permit him to escape his responsibility—." The trial judge sustained defense counsel's objections to both comments and instructed the jury to disregard them. The defendant contends that the prosecutor's remarks were prejudicial, notwithstanding the trial judge's favorable rulings on the objections, and notes that the judge declined to give the jury a tendered instruction setting forth the statutory consequences of a GBMI finding.

We agree that the prosecutor's comments misstated the legal significance of a finding of guilty but mentally ill. "A GBMI offender is no less guilty than one who is guilty and not mentally ill; unlike insanity, a GBMI finding or plea does not relieve an offender of criminal responsibility for his conduct." (*People v. Crews* (1988), 122 Ill. 2d 266, 278.) And the jury's return of a GBMI verdict would not have shielded the defendant from the death penalty. *Crews*, 122 Ill. 2d at 275-81.

In the present case, the trial judge promptly sustained the defendant's objections to the comments. "[A]lthough the prejudicial effect of an improper argument cannot always be erased from the minds of the jurors by an admonishment from the court [citation], the act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice. [Citations.]" (*People v. Baptist* (1979), 76 Ill. 2d 19, 30.) There is no reason to

suppose that the court's rulings were not similarly effective in this case.

In his final challenge to the prosecutor's closing argument during the guilt-innocence phase of the proceedings, the defendant contends that the prosecutor improperly denigrated the expert testimony presented in the case at bar. The defendant complains of the following remark made by the prosecutor during rebuttal argument:

> "Ladies and gentlemen, the great American system that [defense counsel] discussed with you in his opening statement doesn't permit these types of issues to be decided by doctors, psychiatrists, psychologists."

The defendant argues that the remark improperly suggested to the jury that the opinions of the medical experts who testified at trial were irrelevant to the issues presented in the case. Defense counsel failed to object to the prosecutor's comment. Accordingly, any error would generally be deemed waived unless the remark was "so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process." *People v. Albanese* (1984), 104 Ill. 2d 504, 518.

We believe that the jurors would have understood the prosecutor's statement as a proper commentary on their role in the present proceedings. The prosecutor made the challenged remark in the course of reminding the jurors of their duty to resolve the diversity of expert opinions that had been introduced into evidence in the present case. As we have already noted, it was the jury's function to resolve the disputed questions of fact by assessing the credibility of the witnesses, both expert and lay, and by weighing the conflicting testimony. In that regard, no expert opinion was controlling; the eventual decision was committed to the jury's consideration, subject to judicial review. We find no reversible error in the prosecutor's brief statement.

## IV

The defendant also alleges error in a number of rulings in which the trial judge sustained prosecution objections to portions of defense counsel's closing argument at the guilt-innocence phase of the proceedings. The first instance involves comments by the defense concerning the State's burden of proof in a criminal case. The defendant cites the following portion of his trial attorney's argument:

"Finally I would like to say in the instructions you will have the Judge will tell you as to all the elements of the offenses the State has the burden of proof, of proving everything beyond a reasonable doubt.

And if they fail to prove anything beyond a reasonable doubt you cannot find James Seuffer guilty on that charge.

[Assistant State's Attorney]: Objection.

THE COURT: Sustained. The instructions on the law, the Court will make the instructions.

Do not give your own instructions. I'll instruct the jury to disregard the last comment."

The defendant contends that his attorney's remarks were an accurate statement of the law and that the judge's ruling sustaining the prosecutor's objection thus could only have confused the jury about the applicable burden of proof.

The prosecution must prove the elements constituting an offense beyond a reasonable doubt. (*In re Winship* (1970), 397 U.S. 358, 361-64, 25 L. Ed. 2d 368, 373-75, 90 S. Ct. 1068, 1071-73; *People v. Kirilenko* (1953), 1 Ill. 2d 90, 94; Ill. Rev. Stat. 1985, ch. 38, par. 3—1.) When the defense of insanity is raised, however, there is no corresponding requirement that the prosecution disprove that claim, by any quantum of proof. Rather, under Illinois law, a defendant who raises a claim of insanity bears the burden of establishing that defense by a pre-

ponderance of the evidence. (See Ill. Rev. Stat. 1985, ch. 38, pars. 3—2(b), 6—2(e).) Accordingly, we agree with the State that defense counsel's description of the prosecution's burden as requiring proof of "anything" beyond a reasonable doubt was potentially misleading, for the State bore no burden on the separate issue of insanity. As the trial judge had indicated in sustaining the State's objection, the jurors were later instructed on the parties' respective burdens of proof, and the defendant does not claim that the instructions used were incorrect. We conclude that the trial judge's ruling was appropriate, forestalling possible confusion by the jury about the scope of the prosecution's evidentiary burden in the case.

The defendant next contends that the trial judge erred in sustaining an objection to defense counsel's argument summarizing certain testimony given by one of the State's expert witnesses. During closing argument the following ensued:

"[Defense counsel]: You have heard Dr. Lorimer's theory of organic brain disorder and his evidence for it.

You heard Dr. Reifman say in his opinion James Seuffer was sane that night, that morning.

But that he also has what he calls a borderline personality disorder which he says briefly in summary is a case of psychotic personality.

He also said that someone who suffers from a personality disorder such as this, a borderline personality disorder, can under stress become psychotic for brief periods.

[Assistant State's Attorney]: Objection, again.

THE COURT: Sustained.

[Defense counsel]: That was the testimony.

THE COURT: The jury heard the testimony. I don't believe that was exactly the testimony.

[Defense counsel]: May I be heard? I wish to be heard.

THE COURT: Continue, sir.

[Defense counsel]: That's what I heard Dr. Reifman say. Borderline personality can be become [*sic*] psychotic for brief periods under stress.

[Assistant State's Attorney]: Objection.

THE COURT: Sustained."

The defendant contends that trial counsel accurately summarized Dr. Reifman's testimony and that the trial judge therefore erred in sustaining the prosecutor's objections.

Defense counsel's argument was not entirely faithful to Dr. Reifman's testimony. On cross-examination, Dr. Reifman had agreed with defense counsel's suggestion that a person suffering from borderline personality disorder might sometimes "slip into a psychosis for a brief time" when exposed to stress. Dr. Reifman had also stated, though, that he did not believe that the defendant was psychotic. Thus, contrary to defense counsel's initial assertion, Dr. Reifman did not testify that a person with borderline personality disorder is by definition psychotic.

Dr. Reifman allowed, however, that such individuals may sometimes become psychotic, and defense counsel's later comments were consistent with that portion of the testimony. In the present case, the jurors were instructed on the purpose of closing argument and understood that the eventual resolution of the issue rested with them. The jury's function was, of course, highlighted by the trial judge's remark, "The jury heard the testimony." We do not consider that the trial judge's rulings on the State's objections prevented the defendant from arguing his theory of the case to the jury. In these circumstances, we conclude that whatever error occurred was harmless.

## V

The defendant's final arguments concerning the guilt-

innocence phase of the proceedings pertain to jury instructions used at the conclusion of that phase of trial. The defendant first argues that the jury was improperly instructed on the quantum of proof necessary to sustain a verdict of guilty but mentally ill (GBMI). Relying on this court's decision in *People v. Fierer* (1988), 124 Ill. 2d 176, the defendant contends that he is entitled to a new trial because the jury instruction used in the present case did not accurately reflect the statutory requirements for a GBMI finding.

At the time of the defendant's trial, section 115—4(j) of the Code of Criminal Procedure of 1963 provided, in pertinent part:

"When the affirmative defense of insanity has been presented during the trial, the court, where warranted by the evidence, shall also provide the jury with a special verdict form of guilty but mentally ill, as to each offense charged and shall separately instruct the jury that a special verdict of guilty but mentally ill may be returned instead of a general verdict, but that such special verdict requires a unanimous finding by the jury beyond a reasonable doubt that the defendant committed the acts charged and that the defendant was not legally insane at the time of the commission of those acts but that he was mentally ill at such time." (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).)

Thus, the GBMI statute required the State to prove beyond a reasonable doubt that the defendant committed the offense charged and that he was mentally ill, and not insane, at the time of his commission of the offense. See *Fierer*, 124 Ill. 2d at 185.

The GBMI instruction used in the present case did not conform in all respects to the language of section 115—4(j). Instead, the jurors were told that the State was required to prove the following propositions to sustain a GBMI verdict:

> "First, beyond a reasonable doubt that the defendant has committed the offense charged.
>
> Second, by a preponderance of the evidence that the defendant was sane at the time of the commission of the offense.
>
> Third, that the defendant was mentally ill at the time of the commission of the offense."

It is evident that the issues instruction was not entirely consistent with the provisions of the GBMI statute.

This court considered a similar issue in *Fierer*. The GBMI instruction given to the jury in that case required the State to prove the defendant's commission of the offense beyond a reasonable doubt, the defendant's sanity by a preponderance of the evidence, and the defendant's mental illness beyond a reasonable doubt. At the close of the trial, the jury found the defendant guilty but mentally ill. Construing the same statutory language that is applicable to the case at bar, the *Fierer* court determined that the instruction used in that case failed to accurately express the requirements of the statute. Although the defendant in that case had made no objection to the instruction, the court refused to find the issue waived, because the challenged instruction *"misstate[d]* the burden to the defendant's detriment." (Emphasis in original.) (*Fierer*, 124 Ill. 2d at 187.) The court reversed the defendant's conviction and remanded the cause for a new trial, concluding that the error in the instruction was not harmless. The court explained, "The modification of the burden of proof from 'not insane beyond a reasonable doubt' to 'sane by a preponderance of the evidence' had the undeniable effect of making the GBMI verdict easier to attain and more likely to result." *Fierer*, 124 Ill. 2d at 187.

Relying on *Fierer*, the defendant contends that the use in the present case of a similarly deficient jury instruction requires that he also be granted a new trial.

We do not agree. In *Fierer*, the jury rejected the insanity defense and found the defendant guilty but mentally ill. In the case at bar, the jury rejected both the insanity and GBMI options and instead found the defendant guilty. Thus, in the present case, the misstatement in the instruction did not operate to the defendant's detriment, and he cannot be heard to argue that the error was anything other than harmless.

In his final challenge to the guilt-innocence phase of the proceedings, the defendant alleges the occurrence of an additional error in the jury instructions. With respect to the homicide of James Cobb, the defendant raised the alternative contention that the shooting was reckless rather than intentional and that he should be found guilty of no offense greater than involuntary manslaughter. At the defendant's request, the jury was therefore instructed on involuntary manslaughter, and the pattern instruction for that offense was given to the jury. (See Illinois Pattern Jury Instructions, Criminal, No. 7.08 (2d ed. 1981).) Citing this court's decision in *People v. Reddick* (1988), 123 Ill. 2d 184, the defendant now contends that the pattern instruction was defective because it failed to require the prosecution to disprove the existence of the mental state, recklessness, that distinguishes involuntary manslaughter from murder.

In *Reddick*, the court identified two related defects affecting the then-standard instructions for murder and voluntary manslaughter when those instructions were used together in the same trial. First, the instructions for voluntary manslaughter required the State to prove the extenuating conduct that serves to distinguish that offense from murder. *Reddick* noted that when a finding of voluntary manslaughter is urged by the defense as an alternative to a finding of murder, the normal source of proof of extenuation will be the defense, and in those cases strict application of the terms of the instruction

will thus prevent a rigorously literal jury from giving effect to the defendant's mitigating evidence. Second, the instructions for murder failed to require the State to disprove the existence of the extenuating elements. The *Reddick* court believed that when voluntary manslaughter is offered by the defense as an alternative to a murder verdict, the extenuating mental states function as affirmative defenses and, like all other affirmative defenses, except for insanity, should therefore be disproved by the State beyond a reasonable doubt. See Ill. Rev. Stat. 1985, ch. 38, par. 3—2(b).

We do not agree with the defendant's contention that the involuntary manslaughter and murder instructions used in the present case suffered from the defects identified in *Reddick*. This court rejected the same argument in *People v. Lucas* (1989), 132 Ill. 2d 399, 439-42. In that case the court determined that the problems addressed in *Reddick* do not also arise when the instructions for murder and involuntary manslaughter are used in combination. Unlike voluntary manslaughter, involuntary manslaughter is not an extenuated form of murder. As *Lucas* noted, murder and involuntary manslaughter instead require proof of distinct, and inconsistent, mental states. By finding the defendant guilty of murder rather than involuntary manslaughter for the homicide of James Cobb, the jury in the present case clearly rejected the theory that the defendant acted only recklessly in causing Cobb's death.

\* \* \*

Having determined that no reversible error occurred during the guilt-innocence phase of the proceedings, we affirm the defendant's convictions. We have already determined that the defendant must be granted a new sentencing hearing because of a prospective juror's improper exclusion for cause.

For the reasons stated, the defendant's convictions are affirmed and his sentence of death is vacated. The cause is remanded to the circuit court of Cook County for further proceedings.

*Convictions affirmed;*
*sentence vacated;*
*cause remanded.*

JUSTICES BILANDIC, HEIPLE and FREEMAN took no part in the consideration or decision of this case.