(No. 75503.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDGAR HOPE, Appellant.

*Opinion filed September 21, 1995.—Rehearing denied December 4, 1995.*

2

8

Charles M. Schiedel, Deputy Defender, and Kim Robert Fawcett, Assistant Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Edgar Hope, was convicted of one count of murder, one count of attempted murder and two counts of armed robbery. A bifurcated death penalty hearing was subsequently held before the same jury. The jury found the defendant eligible for the death penalty (720 ILCS 5/9—1(b)(3) (West 1992)), and further found that there were no mitigating factors sufficient to preclude imposition of a death sentence. The defendant's sentence has been stayed pending his direct appeal to this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) We now affirm the defendant's convictions and sentence.

## FACTS

The defendant's convictions arise out of the January 11, 1982, armed robbery and shooting at a McDonalds restaurant located at 114th Street and Halsted in Chicago. On that evening, Lloyd Wyckliffe and Alvin Thompson were working as security guards at the McDonalds. Both Wyckliffe and Thompson were wearing plain clothes and were carrying firearms. At approximately 8 p.m., Wyckliffe and Thompson were seated in the restaurant, with a view of the counter area. Anthonette Dawson was working as a cashier behind the counter and Charles Trent was working behind the counter as a shift manager.

Alvin Thompson testified that, at approximately 8 p.m., a black man and a black woman, both in their early twenties, came into the restaurant and placed orders with Anthonette Dawson. The man began switching his order, and Dawson made eye contact with Thompson and Wyckliffe. The two security guards walked over and positioned themselves about five or six feet from the counter. Thompson identified the defen-

dant as the man who was switching orders. Anthonette Dawson also identified the defendant as the man who had been switching orders at her cash register, and further testified that she recognized the woman he was with as Nadine Smart. Charles Trent, the shift manager, also identified the defendant as the man who was switching orders.

After Wyckliffe and Thompson had positioned themselves near the counter area, a second black man entered the restaurant from the west-side door. That man, later identified as Alton Logan, shouted something and Wyckliffe turned to face him. Logan then pulled a sawed-off shotgun from under his coat and shot Wyckliffe in the chest, killing him. Logan took Wyckliffe's gun from his body.

The man identified as the defendant then pushed Thompson down onto the floor and stood over him. The defendant, already armed, searched for and retrieved Thompson's gun. The defendant then fired at Thompson. Thompson, however, turned his head and pulled his arm across his head, causing the bullet to hit him in the left elbow and armpit. Thompson rolled over onto his stomach and pretended to be dead. Thompson stated that the defendant had a "slight smile" on his face just before he fired the shot. The two perpetrators then ran out of the McDonalds. After the men left, Thompson got up and crossed the street to a Jewel food store where he reported the incident to the police. Paramedics arrived and took Thompson to the hospital.

Officer Robert Mantia testified that he and Officer James Doyle were on uniform patrol on February 5, 1982, when they were flagged down by a young man, later identified as Charles Harris, at about 10 p.m. The officers were informed that the defendant was on a particular CTA bus and that there was a warrant out for the defendant's arrest in connection with another crime

(unrelated to the McDonalds incident). Officers Mantia and Doyle stopped the bus and, after Harris pointed out the defendant, boarded it. Officer Doyle reached the defendant first and conducted a pat-down search, finding a drug kit in the defendant's pocket. Officer Doyle walked the defendant toward the front of the bus, with Doyle following the defendant. Officer Mantia then heard a shot fired and saw Officer Doyle fall. Officer Mantia and the defendant exchanged gunfire on and then off the bus. Officer Mantia wounded the defendant outside the bus and the defendant fell to the ground. A fully loaded gun was recovered lying about one foot from the defendant's hand. The gun the defendant had used to shoot Officer Doyle was also recovered from the ground near where the defendant lay wounded.

Detective John Yucaitis traced the gun recovered from next to the defendant's hand as that taken from Alvin Thompson during the McDonalds incident the previous month. Subsequently, Thompson, Anthonette Dawson and Charles Trent, at separate times, each picked the defendant's photograph from a photographic array as one of the assailants. Trent, however, was equivocal in his photographic identification and stated that he needed to see the defendant in person. Later, Thompson, Trent and Dawson separately viewed a lineup at the Cook County jail and identified the defendant as Thompson's assailant in the McDonalds. Each of those three witnesses also identified the defendant in court. In addition, each of those witnesses identified Alton Logan in separate lineups as the man with the sawed-off shotgun in the McDonalds shooting.

The defendant presented the testimony of Thomas Grant. Grant stated that he had accompanied Nadine Smart to the McDonalds at approximately 8 p.m. on January 11, 1982. Grant testified that he did not create a disturbance in line. Grant stated that he heard one

shot and then he ran out of the McDonalds. The defendant also called Officer Bruce Wagner. Officer Wagner had talked with Alvin Thompson at the Jewel store after Thompson was shot. According to Officer Wagner's report of that interview, Thompson stated that one black male entered the McDonalds, created a disturbance in line and then shot both Wyckliffe and Thompson. Officer Wagner stated that Thompson was bleeding profusely when he talked with him and that they spoke only briefly at that time.

The defendant also called Detective Digiacomo. Detective Digiacomo spoke with both Trent and Dawson at the McDonalds after the shooting. According to Digiacomo's report, Trent told him that he saw one offender shoot both security guards, and Dawson told him that Nadine Smart was accompanied by two black males whom she did not recognize. Detective Digiacomo also testified that he interviewed Thompson at the hospital. At that time, Thompson told him that a second offender had pushed him down and shot him.

Following closing arguments, the jury returned a verdict finding the defendant guilty of one count of murder, one count of attempted murder and two counts of armed robbery. A bifurcated death penalty hearing before the same jury was commenced the following day. At the eligibility phase of the death penalty hearing, the State presented a certified copy of the defendant's conviction for the murder of Officer James Doyle, and a certified copy of the defendant's birth certificate, establishing his birthdate of April 22, 1959. The State also introduced testimony from Heather Larkin, a passenger on the CTA bus upon which the Doyle shooting occurred. Larkin testified that two police officers boarded the bus and began talking to a man she identified as the defendant. She further testified that she saw one of the officers walking behind the defendant toward the front

of the bus and that, as they were walking, the defendant pulled a gun out of his coat and started shooting at the police officer.

The defendant presented no evidence at the eligibility phase. Following closing arguments by both sides, the jury returned a verdict finding the defendant eligible for the death penalty. The only statutory eligibility factor upon which the jury was instructed was the "multiple murder" factor of section 9—1(b)(3) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(3) (West 1992)). The aggravation-mitigation phase of the death penalty hearing commenced several days later.

The State first presented the testimony of Dr. Robert Stein, the medical examiner who performed the autopsy on Officer Doyle, who testified regarding the injuries suffered by Officer Doyle. The State also presented the testimony of Larry Garnett, who testified that on January 22, 1982, he returned home to find that his house had been burglarized. Among the items missing from Garnett's house was a .38 snub-nose Llama handgun. A firearms expert, Sergeant Vincent Lomoro, also called by the State, testified that the bullet recovered from Officer Doyle's body was fired from that same .38 snub-nose Llama.

The State presented the testimony of Kevin Paige, another passenger on the CTA bus on which the Doyle shooting occurred. Paige stated that he was shot in the finger during the incident, as a result of which he will never be able to make a fist with that particular hand. Paige further testified that a bullet grazed his face. The State also called Charles Harris, who stated that on February 5, 1982, he flagged down police officers to inform them that the defendant, whom Harris knew, was on a particular CTA bus. Harris testified that, a month earlier, the defendant had hit Harris, pulled out a gun and had taken Harris' money and his radio.

The State also presented various witnesses who testified regarding the defendant's criminal history. In June of 1976, the defendant was accused of threatening to beat a woman if she did not give him money and was arrested while sitting in an automobile on the street with a gun in his hand. The defendant pled guilty to robbery and was sentenced to one year in prison. The defendant was released from prison in 1977. Later that year, the defendant pled guilty to armed robbery and was sentenced to seven years in prison for that offense. Apparently during the defendant's arrest for that offense, the defendant was the driver of an automobile that led police cars in a four- to five-mile chase, during which the defendant was recorded at a speed of 104 miles per hour and at the end of which the defendant rammed his car into two other vehicles to evade the police. The defendant was released from prison for that crime in 1981. In December of that same year, the defendant robbed Charles Harris. In early 1982, the defendant committed the murders of Officer Doyle and Lloyd Wyckliffe. It was stipulated by both sides that, in connection with the Doyle shooting, the defendant was convicted of murder, attempted murder and armed violence.

William Graham, one of the defendant's parole agents, was called by the State. He was assigned to the defendant on July 1, 1977. Three months later, the officer filed a violation of parole due to the defendant's participation in a November 14, 1977, armed robbery. The testimony of Milton Gibbs, now deceased, was also presented by the State. Gibbs was assigned to be the defendant's parole officer in June of 1981. Gibbs placed the defendant on "AWOL" status around January 1982 because he was unable to meet with the defendant. Gibbs was informed by the defendant's mother that the defendant had moved out because some money had been taken. Gibbs' report described the defendant as a person

without any goals and who functioned as an immature person.

The State also presented a number of witnesses who testified regarding the defendant's various incarcerations. The former director of the Cook County department of corrections testified that, when the defendant was brought to the Cook County jail in February 1982, he was placed in the "increased" maximum security area which houses the most dangerous inmates. During the defendant's approximately one-year stay in that facility, the defendant set his cell on fire, a shank was found in the defendant's cell and the defendant was cited for refusing to cooperate with the staff on three or four occasions. The supervisor of reception and classification at Joliet prison testified from prison records that, when the defendant came through that department in June of 1977, he indicated to a counselor that he had been involved with the Disciples street gang for 11 years. When the defendant again came through that department in August of 1978, there was no change in his gang status, and he was classified as maximum security.

The State's evidence revealed that the defendant was disciplined, while in the Cook County jail, for fighting in June of 1986, and for throwing a bucket of water on a guard in March of 1987. The evidence further showed that, during the defendant's September 1978 to June 22, 1981, incarceration in Menard Correctional Center, the defendant committed 45 disciplinary infractions. During the defendant's February 1983 to April 1986 incarceration in Menard, the defendant committed 26 disciplinary infractions, two of which involved weapons. In December of 1989, the defendant was disciplined, while in the Cook County jail, for disturbing officers while they were dealing with another inmate, who was known to be the leader of the Disciples gang.

The defendant called a number of witnesses in mitigation. The defendant first called Sister Miriam Wilson, the Catholic chaplain for the Cook County department of corrections. Sister Miriam stated that she met the defendant in 1982 and that she had been in consistent contact with him ever since. Sister Miriam testified that, over that time, the defendant has grown and developed and was a sensitive, caring person. Sister Miriam further testified that the defendant regrets what he has done and takes responsibility for his life. Sister Miriam admitted on cross-examination that she is personally and religiously opposed to the death penalty. The defendant also called his mother, who testified that she broke up with the defendant's father when he was approximately one year old. His mother stated that the defendant's father would take him to gambling halls as a child. Marie Brown, a Salvation Army worker who had developed a friendship with the defendant, also testified. Brown stated that she visits the defendant frequently and that he helps her with her problems. The defendant also talks to her 16-year-old daughter. Brown stated that she refused the defendant's proposal of marriage.

Robert Neal also testified for the defendant, stating that he had known the defendant for 20 years and that the defendant was a member of his choir. The defendant's sister, Tammy Richardson, testified that the defendant would go to stay with his father at times when he was between 8 and 10 years old. When the defendant returned from these trips, he would be staggering and smelling of alcohol. Gregory Bridges testified for the defense that he was the defendant's second cousin and that the defendant had encouraged him to stay in school and stay out of gangs. Delores Jett testified that the defendant was friends with her younger brother and had been at their house often, where he was helpful. Denise Johnson, the defendant's first cousin, testified that the

defendant's father drank and gambled heavily. Cora Dolly, a former friend of the defendant's father, testified that she was, at times, afraid of the defendant's father. Sharone Brown testified that her mother used to date the defendant and that he had acted like a father to her. Zeala Bonds, Cora Dolly's daughter, testified that the defendant used to live with them and that he had, since his incarceration, helped to straighten out her sons. John Lyke, the defendant's half-brother, testified that the defendant has been a positive influence on his studies. Finally, David Randall, a sentencing consultant, testified that he had interviewed friends and family of the defendant and had prepared a sentencing report on the defendant. Randall stated that the defendant had had a chaotic childhood, with a father who was a gambler and an alcoholic, and that the defendant had begun abusing substances at an early age.

Following closing arguments, the jury deliberated and returned a verdict finding that there were no mitigating factors sufficient to preclude a death sentence. Accordingly, the trial court sentenced the defendant to death.

## ANALYSIS

The defendant raises a number of issues regarding the propriety of his convictions and death sentence. With regard to his convictions, the defendant claims that reversal is warranted because: (1) the prosecution improperly exercised a peremptory challenge to excuse potential juror Sharon Warner; (2) the trial court improperly restricted the defendant's cross-examination of Detective Yucaitis regarding certain news articles; and (3) the prosecutor committed reversible error when he made certain comments in closing argument about the actions of a defense attorney at the defendant's lineup. With regard to his death sentence, the defendant claims that reversal is warranted because: (1) the

18

trial court improperly refused some of the defendant's requested *voir dire* questions regarding the death penalty; (2) the trial court erroneously denied the defendant's motion to remove a juror for cause; (3) evidence regarding the defendant's gang affiliation was improperly admitted at the sentencing hearing; (4) evidence regarding the autopsy on Officer Doyle was improperly admitted at the sentencing hearing; (5) evidence regarding the theft of the gun used to shoot Officer Doyle was improperly admitted at the sentencing hearing; (6) the trial court erroneously refused several jury instructions requested by the defendant; (7) the defendant's eligibility for the death penalty has been invalidated; and (8) the Illinois death penalty statute is unconstitutional.

## I. Trial Issues

### *Removal of Juror Warner*

The defendant asserts that a new trial is warranted on the ground that the prosecution improperly used one of its peremptory challenges to excuse venireperson Sharon Warner. During the *voir dire*, the defendant objected to the State's use of its peremptory challenges to remove black venirepersons and asked for a hearing pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, to determine if the State's challenges were racially motivated. As to each of the excused jurors, the trial court found that the defendant had not established a *prima facie* showing that the State was exercising peremptory challenges based on race, but also went on to make the finding that the prosecutors' articulated reasons for their exclusion were race-neutral. The defendant sets forth the arguments made by the parties and the trial court's rulings as to a number of the black jurors excused by the State. However, as to all but juror Warner, the defendant

concedes that the trial court's ruling, that racial discrimination had not occurred, was correct. The defendant takes exception only to the trial court's ruling that the exclusion of Warner was not racially motivated.

The United States Supreme Court has instructed that an objection of racial discrimination under *Batson* is to be subjected to a three-step process:

> "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. [Citation.] Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. [Citation.] Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." (*Hernandez v. New York* (1991), 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866.)

In this case, the prosecution volunteered its explanations for excusing the challenged venirepersons, without the trial court first determining that the defendant had established a *prima facie* case. Under these circumstances, the question of whether the defendant satisfied step one of the *Batson* inquiry is rendered moot. *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.

The defendant claims that the prosecution failed to satisfy its burden of articulating a race-neutral reason for the exclusion of Warner. The Supreme Court has dictated that a race-neutral explanation, within the context of the *Batson* inquiry, is an explanation:

> "based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (*Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.)

The Supreme Court has recently further clarified the meaning of "race-neutral explanation." In *Purkett v.*

20

*Elem* (1995), 514 U.S. 765, 767-68, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1771 (*per curiam* summary disposition), the Court stated that "[t]he second step of [the *Batson*] process does not demand an explanation that is persuasive, or even plausible." A "legitimate reason," the Court stated, "is not a reason that makes sense, but a reason that does not deny equal protection." (*Purkett*, 514 U.S. at 769, 131 L. Ed. 2d at 840, 115 S. Ct. at 1771.) In *Purkett*, the Court addressed a black defendant's objection, under *Batson*, to the prosecution's use of a peremptory challenge to remove a black venireman. The Court held that the reason proffered by the prosecutor in that case, that the venireman was excused because of "long, unkempt hair, a mustache, and a beard," was race-neutral and satisfied the prosecutor's burden of articulating a nondiscriminatory reason for the strike. Accordingly, the Court held, the inquiry properly proceeded to step three, where the trial judge found that the prosecutor was not motivated by discriminatory intent.

We conclude that, under these precedents, there is no basis for reversing the trial court's ruling upholding the removal of Warner by the State. The prosecutor proffered several reasons for the removal of Warner. The prosecutor explained that Warner's "background" did not make her the kind of juror the State wanted on this jury, citing her occupation (free-lance writer), residence (Hyde Park) and religion (Buddhist). The trial court ruled that the defendant had failed to show purposeful discrimination. The trial court stated, "there were good neutral reasons, it seems to me just obvious from looking at these three people (Warner and two other jurors whose exclusion was challenged under *Batson*) and the way that they responded to questions why the State would choose to exclude them."

Under *Hernandez* and *Purkett*, the reasons asserted

by the State here were race-neutral within the context of *Batson*. None of the reasons proffered, occupation, residence or religion, were based upon the race of the jurors, and discriminatory intent is not inherent in any of those explanations. This court, too, has previously recognized that both the employment and the residence of a potential juror may constitute race-neutral reasons for excluding the juror. (*People v. Kitchen* (1994), 159 Ill. 2d 1, 22 (employment); *People v. Mack* (1989), 128 Ill. 2d 231, 241 (employment); *People v. Andrews* (1993), 155 Ill. 2d 286, 302 (residence near scene of crime).) Those explanations may, therefore, properly be considered race-neutral. *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.

Given the State's articulation of race-neutral explanations, it was appropriate for the trial judge to proceed to make the factual determination of whether purposeful discrimination had been shown. A trial judge's determination on the issue of purposeful discrimination at a *Batson* hearing is a finding of fact that is to be accorded great deference on review. (*Hernandez*, 500 U.S. at 364-65, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869; *People v. Wiley* (1995), 165 Ill. 2d 259, 274; *People v. Williams* (1994), 164 Ill. 2d 1, 19.) Such deference is owed because the determination will be largely a matter of credibility, which is uniquely within the province of the trial judge. (*Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869; *Wiley*, 165 Ill. 2d at 274.) The trial judge's ruling will be set aside only if it is clearly erroneous. *Williams*, 164 Ill. 2d at 19.

We cannot say that the trial judge's determination, that the exclusion of Warner was not the result of purposeful discrimination, was clearly erroneous. As noted, there was nothing inherently discriminatory in any of the reasons asserted by the State. The trial judge was in the best position to assess the answers given by

the potential jurors as well as the credibility of the prosecutor in asserting his reasons for excluding Warner. See *People v. Fair* (1994), 159 Ill. 2d 51, 74.

The defendant argues further that reversal is required because Warner's equal protection rights were violated, asserting that Warner's removal was based upon her religion. The defendant overlooks the fact that religion was just one of three race-neutral reasons proffered by the prosecution for the removal of Warner. We find that the prosecutor's reasons, exclusive of Warner's religion, were sufficient to satisfy the State's burden at step two of the *Batson* inquiry under the applicable precedents.

Accordingly, we hold that the State's removal of juror Warner does not warrant reversal of the defendant's convictions.

### Cross-Examination of Detective Yucaitis

The defendant next argues that a new trial is warranted because he was not allowed, on cross-examination, to question Detective John Yucaitis with regard to whether the detective had seen particular newspaper articles pertaining to the defendant. Detective Yucaitis was the police officer who traced one of the guns recovered from the defendant after the CTA bus shooting as that belonging to Alvin Thompson, and who showed a photo array containing the defendant's picture to Thompson in order to obtain an identification. During cross-examination of Detective Yucaitis, defense counsel asked him if he recalled seeing a February 6, 1982, newspaper headline indicating that a police officer had been slain on a CTA bus. Detective Yucaitis testified that he did not see any newspapers that day. Defense counsel then asked Detective Yucaitis whether he recalled seeing such a newspaper headline in the February 7, 1982, newspaper. In response to that question, Detective Yucaitis testified, "I would imagine I did, sir."

The State then requested a sidebar at which the defense articulated its intention to show the witness the February 6 and 7, 1982, headlines to which the questioning had pertained. The trial court stated that it sustained the State's objection, and the defendant did not attempt any further cross-examination of Detective Yucaitis.

The defendant now contends that he was impermissibly denied the right to inquire whether Detective Yucaitis had seen the February 6 and 7 articles which pertained to the defendant. We disagree. First, we note that the record indicates that the defendant did in fact ask Detective Yucaitis about both the February 6 and the February 7, 1982, newspaper articles. With regard to the February 6, 1982, article, Detective Yucaitis testified that he had not seen it. Thus, it would seem that no further questioning on that particular article was available. With regard to the February 7, 1982, article, Detective Yucaitis appears to have answered that he imagined he would have seen that newspaper. Thus, it appears that the defendant was not precluded from asking Detective Yucaitis whether he had seen either of these two articles.

Even if the defendant's claim that he was restricted in his cross-examination of Detective Yucaitis on the subject of newspaper articles is accurate, we still find no error in the trial court's actions. The decision to admit or exclude evidence is left to the sound discretion of the trial judge, and that decision will not be overturned on review absent a clear abuse of that discretion. (*People v. Peeples* (1993), 155 Ill. 2d 422, 456.) The admissibility of evidence is dependent upon a showing that it is legally relevant. (*Peeples*, 155 Ill. 2d at 456.) Relevant evidence is evidence having "any tendency to make the existence of any fact in consequence to the determination of the action more or less probable than it would be without the evidence." (*Peeples*, 155 Ill. 2d at 455-56.) Testimony

from Detective Yucaitis as to whether or not he saw a newspaper article or photo of the defendant was not relevant in this case. Detective Yucaitis was not a witness to the crimes who was being asked to identify the defendant as a perpetrator. Rather, Detective Yucaitis was merely a police officer participating in the investigation of the crimes. Thus, whether Detective Yucaitis saw or did not see a newspaper article pertaining to the defendant was irrelevant.

The defendant argues that his constitutional right to present his theory of defense, as well as his right to cross-examine witnesses with regard to that theory, was violated by the trial court's actions. (See *Crane v. Kentucky* (1986), 476 U.S. 683, 90 L. Ed. 2d 636, 106 S. Ct. 2142.) We disagree. The defendant's theory was suggestive identification and nothing in the trial court's ruling prevented the defendant from eliciting testimony which was relevant to that theory. With regard to the actual *witnesses* to the crimes, Thompson, Dawson and Trent, nothing stopped defense counsel from questioning those witnesses as to whether they had seen any news articles or photographs pertaining to the defendant. The defense, however, chose not to pose any questions to Thompson or Dawson regarding the articles. As for Trent, defense counsel asked him whether he had seen a February 6, 1982, photograph of the defendant in the newspaper, to which Trent answered that he had not. Defense counsel did not ask Trent about a February 7, 1982, newspaper article, although no ruling or objection hindered him from doing so. The defendant was not prevented in any manner from pursuing his theory of suggestive identification.

Accordingly, we hold that the trial court did not abuse its discretion with regard to the scope of the defendant's cross-examination of Detective Yucaitis.

*Prosecution's Closing Argument*

The defendant also asserts that he is entitled to a new trial because of certain comments made by the prosecution during closing argument regarding the defendant's pretrial lineup.

At trial, the defense pursued the theory that the defendant was misidentified due to a suggestive lineup. During the State's rebuttal closing argument, the prosecutor responded to this theory by commenting that the defendant had been represented at the lineup by Robert Lee, an assistant public defender. The prosecutor went on to argue as follows:

"[Prosecutor]:The assistant public defender, Robert Lee, was present at this lineup, okay? If there was anything going on about a frame or any kind of suggestive identification in this lineup, you would have seen Bob Lee here in a split second to tell you that and to infer—

[Defense Counsel]: Objection.

THE COURT: That's sustained. Now, the Defense has no burden here. The burden is on the State. I want to make that clear. You may continue.

[Prosecutor]: I'll tell you this. If they were suggesting in any manner, shape, or form that Edgar Hope, while his attorney was there, Robert Lee, should be picked out, or there's any kind of inference that they pick out the—pick out the guy with the piece of paper, if Bob Lee saw anything wrong with this lineup, they wouldn't have had the lineup. Bob Lee would have stopped it.

[Defense Counsel]: Objection, your Honor.

THE COURT: That's sustained.

[Prosecutor]: That's just another effort to get you to look out in left field. These people are identifying Edgar Hope by a piece of paper in his pocket while his attorney's standing right there.

[Defense Counsel]: Objection, your Honor. That wasn't the testimony.

THE COURT: No, there was—overruled.

[Prosecutor]: Detective Thomas Bennett testified, and make no mistakes about it. Look at your notes. Assistant public defender, Bob Lee, his attorney, was present at the

lineup. I'm not here to misstate the evidence to you, ladies and gentlemen."

The defendant charges that these comments by the prosecution denied him a fair trial. The defendant argues that defense counsel at a lineup is not authorized to direct or control the lineup and it was therefore error for the prosecution to suggest to the jury that Bob Lee would have stopped the lineup had he believed it was suggestive. The defendant also argues that the comments effectively used the defendant's decision to exercise the right to counsel as a weapon against him.

We agree with the State that the comments pointed to by the defendant do not require reversal in this case. The comments challenged by the defendant were made during the prosecutor's closing argument. This court has recognized that counsel for both sides are to be afforded latitude in closing arguments, and remarks made in closing will not merit reversal unless they result in substantial prejudice to the defendant. (*Peeples*, 155 Ill. 2d at 482; *People v. Henderson* (1990), 142 Ill. 2d 258, 323.) We find that no substantial prejudice accrued to the defendant as a result of these comments.

The record reveals that the defendant's objections to these comments were sustained by the trial court. The trial court's act of promptly sustaining a defense objection to a closing argument comment is generally sufficient to cure any error which may have occurred. (*People v. Seuffer* (1991), 144 Ill. 2d 482, 516; *Henderson*, 142 Ill. 2d at 322.) There is no reason to suppose that the trial court's rulings sustaining the defense objections were not effective here. In addition, the jury here was instructed that closing arguments are not evidence and that "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." This court has held that such an instruction may serve to alleviate any possible prejudice from an erroneous closing comment by the State. (*Peeples*,

155 Ill. 2d at 482; *Henderson*, 142 Ill. 2d at 326.) This circumstance, then, also persuades us that no substantial prejudice accrued to the defendant as a result of the prosecutor's comments.

Finally, we note that the evidence supporting the defendant's guilt in this case was overwhelming. That evidence included a positive identification of the defendant by three different eyewitnesses, one of whom was a victim of the crimes. In contrast, the references to the actions of the defendant's attorney at the lineup were minimal and fleeting. We further note that the fact that public defender Bob Lee was present and representing the defendant at the lineup was first elicited during the direct examination of Thomas Bennett, *without objection* by the defendant. Given these circumstances, we find that the prosecutor's comments, even if erroneous, did not cause substantial prejudice to the defendant. Reversal of the defendant's convictions is, therefore, not warranted. *Seuffer*, 144 Ill. 2d 482.

The defendant urges that he suffered substantial prejudice as a result of the prosecutor's remarks because the remarks impinged upon his constitutional right to argue his theory of suggestive lineup to the jury. We disagree. The defendant is of course correct in his assertion that he is constitutionally entitled to present and argue his theory of defense to the jury. (*Crane v. Kentucky* (1986), 476 U.S. 683, 90 L. Ed. 2d 636, 106 S. Ct. 2142.) However, we fail to see how the prosecutor's remarks violated the defendant's right to argue his defense. The defendant questioned the identification witnesses on the issue of whether the lineup was conducted in a suggestive manner. In addition, defense counsel argued his theory of suggestive identification to the jury during closing argument. Thus, the defendant was not in any manner denied his right to present his theory of defense to the jury.

In sum, we hold that the defendant is not entitled to a new trial based upon the prosecutor's comments in closing argument because the defendant has not shown that he suffered substantial prejudice as a result of the comments. Given this resolution, we make no comment on the issue of the appropriate role of defense counsel at a pretrial lineup.

## II. Sentencing Issues

### *"Life-Qualifying" Voir Dire*

The defendant argues that he was denied a fair sentencing hearing due to the trial court's refusal to ask certain questions submitted by the defense during the court's *voir dire* of potential jurors. The defendant submitted a list of proposed *voir dire* questions which included, *inter alia*, 10 questions under the heading of "Reverse Witherspooning or Life Qualifying." The trial court agreed to "reverse-*Witherspoon*" the potential jurors by asking them whether they would automatically vote for death if the defendant was found guilty of murder. However, the trial court refused the remainder of the defendant's proposed "reverse-*Witherspoon*" questions.

The defendant asserts that the trial court erred in refusing to give all of his proposed "reverse-*Witherspoon*" questions. The defendant focuses on the last two questions, both of which asked whether the potential juror would automatically vote to impose the death penalty if the jury should convict the defendant of murder and if they should be told that he was eligible for death because he had been convicted of another murder. The remainder of the rejected questions on the defendant's list were similar to those two, except that they added specific facts about the other (Doyle) murder conviction.

The defendant argues that the trial court's refusal

violated his right to an impartial jury at sentencing. The defendant cites *Morgan v. Illinois* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222, and argues that that decision entitled him to have all of his proposed "life-qualifying" questions asked of the potential jurors. The defendant, however, reads *Morgan* far too broadly.

In *Morgan*, the Supreme Court held that the trial court in a capital case is constitutionally required, if requested by the defendant, to ask potential jurors during *voir dire* whether they would automatically vote for the death penalty if the defendant was convicted of murder. (*Morgan*, 504 U.S. at 734-39, 119 L. Ed. 2d at 506-09, 112 S. Ct. at 2232-35.) The Court in *Morgan* based its holding on the following reasoning:

"A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. *** Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views." *Morgan*, 504 U.S. at 729, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229.

The trial court in this case fully complied with *Morgan*. *Morgan* held only that the defendant is entitled to have potential jurors questioned as to whether they would *automatically* vote to impose the death penalty upon a finding of guilt, *without regard* to the aggravating or mitigating circumstances present in the case. The trial judge asked all the potential jurors whether they would automatically vote to impose death if they should convict the defendant of murder. The further questioning desired by the defendant, inquiring into how the venire members would act given a particular aggravating circumstance, *i.e.*, the Doyle murder conviction, is clearly not required by *Morgan*. To the contrary, *Morgan* specifically directed its holding toward the end of discovering jurors for whom "the presence or absence of

either aggravating or mitigating circumstances is entirely irrelevant." (*Morgan*, 504 U.S. at 729, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229.) Conducting inquiry into whether a potential juror would vote to impose the death penalty, *given a particular set of circumstances*, is thus not required by *Morgan*.

We find that the trial court's refusal to ask all of the defendant's requested *voir dire* questions does not warrant reversal. The conduct and scope of jury *voir dire* is within the discretion of the trial court. (*People v. Cloutier* (1993), 156 Ill. 2d 483, 495; *People v. Howard* (1991), 147 Ill. 2d 103, 136.) The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those venirepersons whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath. (*Cloutier*, 156 Ill. 2d at 496.) Only when the trial court's actions have frustrated the purpose of *voir dire* will an abuse of discretion be found. (*Cloutier*, 156 Ill. 2d at 496.) We find no abuse of discretion in the trial court's refusal to ask all of the defendant's proposed "reverse-*Witherspoon*" questions. The trial judge's questioning was adequate to ensure that those jurors who would fail to consider all of the aggravating and mitigating circumstances were discovered. Reversal on this ground is not warranted.

### Failure to Remove Juror Turchen

The defendant next claims that he is entitled to a new sentencing hearing because of the trial court's denial of the defendant's motion to excuse juror Jamie Turchen for cause. The defendant again relies on *Morgan v. Illinois* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222, and argues that Turchen should have been removed for cause because of her answers to *voir dire* questions concerning her willingness to impose the death penalty. We find no abuse of discretion in the

trial court's ruling on the defendant's motion to remove for cause.

The trial court is granted wide discretion in ruling on a motion to excuse a potential juror for cause based upon the juror's *voir dire*. (*Seuffer*, 144 Ill. 2d at 502.) In reviewing such a ruling, the entire *voir dire* of the juror must be considered, rather than selected answers. (*Peeples*, 155 Ill. 2d at 462-63; *People v. Stewart* (1984), 104 Ill. 2d 463, 486.) The trial judge's ruling is entitled to substantial deference because the trial judge is in the best position to determine the meaning of the juror's remarks. *People v. Steidl* (1991), 142 Ill. 2d 204, 244; *Stewart*, 104 Ill. 2d at 486.

The defendant claims that juror Turchen should have been removed for cause under *Morgan*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222. In *Morgan*, the Supreme Court held that a juror who would automatically vote to impose the death penalty for every murder conviction, without regard to the aggravating or mitigating evidence presented, is properly removed for cause. (*Morgan*, 504 U.S. at 728-29, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229.) We find that juror Turchen did not fall into the category of persons contemplated in *Morgan*.

The defendant points to the following *voir dire* of Turchen as support for his argument. During questioning by defense counsel, the following exchange took place:

"Q. Is there anything about the nature of the offense, armed robbery and murder, that sets you off one way or the other?

A. No.

Q. You mentioned, counsel asked you about the death penalty, I would like to ask you a question related to that.

Would you automatically impose the death penalty if you found Edgar Hope guilty of armed robbery and murder?

A. If the evidence showed or the, as he had put it, you know the evidence was there, yes, I would.

Q. And would you do that just because you found him guilty without regard to his background or circumstances of the crime?

A. Yes."

It is upon this last answer by Turchen that the defendant bases his contention that her removal for cause was required under *Morgan.* We disagree. We find that, when the entire *voir dire* of Turchen is reviewed, she was not revealed to be a person who would automatically vote for the death penalty upon a finding of guilt.

The "yes" answer relied upon by the defendant was not a statement by Turchen that she would automatically vote for the death penalty, when viewed, as it must be, in conjunction with the statements that surround it. Prior to this answer, Turchen had just stated that she could vote for the death penalty if "the evidence was there" to support it. Further, in response to subsequent questioning in this area, Turchen clarified that she did not have views about the death penalty which would impair the performance of her duties as a juror.

During the State's subsequent *voir dire* of Turchen, she stated as follows:

"Q. Do you understand that there would be a second part to the trial if there is a termination [*sic*] of guilt?

A. Yes.

Q. And under that second part of the trial, you'll be instructed as to the law to follow to determine whether death is appropriate. Do you understand that?

A. Yes.

Q. And could you follow that law?

A. Yes."

The trial court went further in this line of questioning as follows:

"Q. In other words, in that second hearing, okay, this is assuming that there was a finding of guilty, now?

A. Right.

Q. Assuming that there was a finding of guilty at the hearing, the first thing would be whether or not a person,

you know, fits into certain categories, that is whether they would be eligible to receive capital punishment?

A. Right.

Q. And assuming that that occurred, here, then, the next question is, should they be put to death, okay.

Now, both sides would have the opportunity to present evidence and reasons why the person under those circumstances should be or should not be sentenced to death, now, would you be able to listen to those reasons and that evidence, that type of evidence in coming to your determination?

A. Yes, I would.

Q. Okay, would you promise me that you would listen to both sides during that?

A. Yes.

Q. Now, if you thought that the death penalty was appropriate, you would impose capital punishment?

A. Yes, I would.

Q. And if it was not appropriate, you would not?

A. No, I would not.

Q. Okay, so you would listen to the hearings all the way through with a view towards making a determination and following the law, is that it?

A. Yes."

We determine that this subsequent *voir dire* of Turchen reveals that she was not a juror whose removal for cause was mandated under *Morgan*. Turchen clarified her position on her willingness to consider the evidence in determining whether to impose the death penalty. Her answers made clear that she would not be a juror for whom "the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant." (*Morgan*, 504 U.S. at 729, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229.) We have held that a potential juror's views on the death penalty will warrant removal for cause only if they substantially impair the performance of his or her duties as a juror. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 416.) Turchen's *voir dire* answers did not reveal her to be a person for whom that would be the

case. In light of the foregoing, we find that the trial court's denial of the motion to excuse Turchen for cause was therefore not an abuse of discretion.

### Validity of Eligibility Finding

The defendant also contends that his death sentence must be reversed because his eligibility for that sentence, premised upon his conviction for the Doyle murder, was invalidated when this court reversed his conviction in the Doyle case. (See *People v. Hope* (1992), 147 Ill. 2d 315.) We disagree. This court's reversal of the defendant's conviction for the Doyle murder directed that the defendant be retried for that offense. The record reveals, and the defendant concedes, that the defendant has been retried for that offense, under the same indictment, and has again been found guilty of the intentional or knowing murder of James Doyle. Under these particular facts, we hold that the defendant's eligibility finding remains valid.

As noted, the defendant's eligibility was premised upon the "multiple-murder" aggravating factor set forth in section 9—1(b)(3) of the death penalty statute (720 ILCS 5/9—1(b)(3) (West 1992)). To establish eligibility under that factor the State must prove beyond a reasonable doubt that: (1) the defendant was at least 18 years old at the time he committed the murder for which he is being sentenced; (2) the defendant was convicted of another murder in addition to the one for which he is being sentenced; and (3) the defendant, in committing each of the murders, acted with the requisite intent or knowledge. (720 ILCS 5/9—1(b)(3) (West 1992); *People v. Davis* (1983), 95 Ill. 2d 1, 32-36.) Each of these three elements was undeniably proved at the defendant's eligibility hearing in this case.

The defendant's birth certificate was introduced to establish that he was at least 18 years old at the time of the McDonalds murder. A certified statement of the

defendant's conviction for the murder of Doyle proved the second element, that the defendant had been convicted of another murder. (*People v. Franklin* (1990), 135 Ill. 2d 78, 106-07.) Finally, the defendant's intent or knowledge in committing the murder of Doyle was established through the testimony of Heather Larkin, a passenger on the bus on which Doyle was shot. As noted, Larkin described watching the defendant pull a gun from his coat and shoot Officer Doyle in the chest, killing him. This testimony was more than sufficient to support a finding, beyond a reasonable doubt, that the defendant acted with the requisite intent or knowledge in murdering Doyle. *Davis*, 95 Ill. 2d at 36.

The finding that the defendant was eligible under section 9—1(b)(3) was thus unquestionably valid at the time it was made. The defendant, however, contends that the later reversal of the Doyle conviction invalidates that finding. We note that the defendant makes no challenge to the findings that he was the proper age for eligibility or that he acted with the requisite mental state in committing the Doyle murder. Rather, the defendant seeks to invalidate his eligibility finding solely on the ground that the finding of a prior conviction for murder is now infirm because of the later proceedings in the Doyle case. We disagree.

The defendant's conviction for the Doyle murder was reversed and remanded by this court based upon a violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, during jury selection. Unlike the case of a reversal based upon insufficiency of the evidence, which would bar a retrial on double jeopardy principles, this was a reversal based upon trial error, and double jeopardy therefore did not preclude a retrial. (*People v. Olivera* (1995), 164 Ill. 2d 382, 393.) The reasoning allowing a retrial in a case such as this is that the reversal " 'implies nothing with respect to the guilt

or innocence of the defendant,' but is simply 'a determination that [he] has been convicted through a judicial *process* which is defective in some fundamental respect.' " (Emphasis in original.) (*Lockhart v. Nelson* (1988), 488 U.S. 33, 40, 102 L. Ed. 2d 265, 273, 109 S. Ct. 285, 290, quoting *Burks v. United States* (1978), 437 U.S. 1, 15, 57 L. Ed. 2d 1, 12, 98 S. Ct. 2141, 2149.) Under these circumstances, we do not believe that it would be consistent with the intent of the legislature to interpret the death penalty statute to forbid this reconviction from relating back to satisfy the requirement of section 9—1(b)(3) that the defendant has been convicted of another murder.

The purpose of the eligibility factors enumerated in section 9—1(b) is to "narrow the class of persons eligible for the death penalty and *** reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." (*Zant v. Stephens* (1983), 462 U.S. 862, 877, 77 L. Ed. 2d 235, 249-50, 103 S. Ct. 2733, 2742.) Persons who have murdered more than once are in a smaller group than the class of all murderers, and it is reasonably justified to place a more severe punishment on those persons. Our legislature has further required that the "other" murder must have resulted in a conviction. (720 ILCS 5/9—1(b)(3) (West 1992).) In this way, the legislature has sought to guard against the arbitrary and capricious imposition of the death penalty prohibited by the eighth amendment. We find that the eighth amendment concerns would not be any better served by requiring that the "other" murder conviction be treated as nonexistent simply because it is later reversed, where the defendant has been retried and reconvicted of the same charge and offense. The defendant remains a member of that narrower class of persons who have been convicted of murdering more than once, and the purpose of the eligibility determination is not frustrated.

We emphasize that our holding is based upon the unique circumstances of this case. The defendant's reconviction is relating back only for the purpose of proving the existence of another murder conviction required by section 9—1(b)(3), not to prove the acts or mental state underlying that conviction. The "conviction" element of section 9—1(b)(3) is satisfied when there is proof that a trial judge has entered judgment on a verdict of guilty of murder. (*People v. Franklin* (1990), 135 Ill. 2d 78, 106.) Whether the defendant acted with the requisite mental state is a separate issue. At the defendant's eligibility hearing, his actions and mental state in committing the Doyle murder were proved, not through the certified copy of the Doyle murder conviction, but through the testimony of Heather Larkin. The defendant makes no challenge to the sufficiency or validity of that evidence, and thus makes no contention that the mental state element of section 9—1(b)(3) was not satisfied. Accordingly, we hold that, because the defendant has been reconvicted of the murder of Doyle under the same indictment, the defendant's conviction for that murder satisfies the requirement of section 9—1(b)(3) that the defendant has been convicted of another murder in addition to the one for which he is being sentenced. Because the defendant makes no other challenge to his eligibility finding, that finding will not be disturbed.

### Gang Evidence

The defendant next challenges his death sentence on the ground that evidence of the defendant's gang affiliation was improperly allowed at his sentencing hearing. We find that the defendant is not entitled to a new sentencing hearing on this ground.

The defendant contends that he was denied a fair sentencing hearing due to the admission of the following testimony which, he argues, improperly evidenced

or suggested that he was affiliated with a gang. William Doyle, the supervisor of reception and classification at Joliet Correctional Center, testified from Department of Corrections reports that, upon the defendant's admission into Joliet prison on June 10, 1977, the defendant admitted to a counselor that he had been involved with the Disciples street gang for approximately 11 years. Sergeant Mattie McClendon testified with regard to an incident at the Cook County jail on December 6, 1989, which involved the defendant. Sergeant McClendon stated that officers were talking to inmate Jerome Freeman, known to be the leader of the Disciples gang, when the defendant walked in and asked the officers "why they were bothering his leader." The defendant was restrained by the officers, and received five days' segregation as punishment.

Sergeant Sam Bullocks testified regarding two incidents involving the defendant during his incarceration. In one incident, inmate Leonard Kidd claimed that he was being forced to join a gang and, when he refused, a fight broke out which involved the defendant. In the second incident, a few days later, the defendant acted as a lookout while other inmates beat Leonard Kidd. The defendant received 15 days' segregation as discipline for these incidents.

We find no reversible error in the admission of the aforementioned evidence. Gang-related evidence is admissible at the aggravation-mitigation phase of a capital sentencing hearing as long as it satisfies the requirements of relevancy and reliability. (*People v. Coleman* (1994), 158 Ill. 2d 319, 356; see also *People v. Patterson* (1992), 154 Ill. 2d 414, 458 (evidence of gang affiliation properly introduced during guilt phase of capital trial).) A defendant's conduct while incarcerated is relevant at the aggravation-mitigation stage of a death penalty hearing. (*People v. Simms* (1991), 143 Ill.

2d 154, 179; *People v. Hall* (1986), 114 Ill. 2d 376, 417.) Accordingly, evidence of gang-related activity is proper if it is demonstrative of the defendant's behavior and discipline while in prison. (*Coleman*, 158 Ill. 2d at 356.) The fact that the evidence also has a tendency to prejudice the defendant does not require its exclusion. *Patterson*, 154 Ill. 2d at 458.

The testimony of both Officer McClendon and Officer Bullocks was specifically centered on incidents of misconduct by the defendant while he was incarcerated, for which he received discipline. Thus, this testimony was relevant to the defendant's behavior while in prison and was properly considered at the defendant's sentencing hearing. The defendant essentially concedes the relevance of this testimony, but argues that its probativeness was outweighed by its prejudice. We disagree. In this regard, we note that the first mention of the defendant's membership in a gang was elicited by *defense counsel* during the cross-examination of Charles Harris, who was asked about an incident in which the defendant prevented an attack upon Harris in jail by a group of gang members. Harris testified that the defendant "seemed like ... he had to be a gang banger himself." Given that the defendant elicited this testimony, which at least suggested his membership in a gang, we fail to see how the relevant testimony of Officers McClendon and Bullocks could be found to be too prejudicial to be admitted.

The testimony of William Doyle, unlike that of Officers McClendon and Bullocks, addressed only the defendant's involvement with a gang, as opposed to specific instances of gang activity. The defendant argues that, under *Dawson v. Delaware* (1992), 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093, admission of this testimony requires a new sentencing hearing because it violated his first amendment right to freedom of associa-

tion. In *Dawson,* the Supreme Court held that it was violative of the first amendment to introduce at a capital sentencing hearing evidence of the defendant's membership in a white racist gang because the prosecution had failed to establish the relevance of such evidence to any issue at the hearing. The Court noted, however, that there was no *per se* barrier to introduction of gang affiliation simply because such affiliation was protected by the first amendment, as long as the relevance of the evidence was established. (*Dawson,* 503 U.S. at 164, 117 L. Ed. 2d at 316-17, 112 S. Ct. at 1097.) The *Dawson* Court suggested that such relevance could have been established by evidence that the gang in question had committed or endorsed violent acts. *Dawson,* 503 U.S. at 166-67, 117 L. Ed. 2d at 318, 112 S. Ct. at 1098.

We conclude that the allowance of William Doyle's testimony does not require reversal of the defendant's sentence. Consistent with *Dawson,* the relevance of the defendant's gang affiliation was established through the fact that he was involved in, and disciplined for, gang-related violence and unlawful behavior. Moreover, we have already decided that evidence that showed or suggested that the defendant was involved in a gang was properly presented to the jury through the relevant testimony of Officers McClendon and Bullocks. The defendant himself elicited testimony suggesting his gang affiliation from Charles Harris. The fact of the defendant's gang affiliation was thus properly before the jury, and we do not see how the additional testimony from William Doyle could have prejudiced the defendant. We further note that the defendant did not object to William Doyle's testimony. In fact, during cross-examination of Doyle, defense counsel elicited *further* information regarding the defendant's gang affiliation, establishing that the defendant became involved in the gang at the age of seven. Accordingly, even if Doyle's

testimony should have been excluded, we find that its admission was harmless beyond a reasonable doubt, given the other, admissible evidence of the defendant's gang affiliation. (See *People v. Ward* (1992), 154 Ill. 2d 272, 341-44.) Reversal of the defendant's sentence on this ground is not required.

### Autopsy Evidence at Sentencing Hearing

The defendant next charges that reversible error occurred at his sentencing hearing because the trial court failed to exclude testimony from the medical examiner regarding the autopsy on Officer Doyle. Our review of the record reveals, however, that the defendant did not object to any of this testimony by the medical examiner, Dr. Stein. The issue of the propriety of that testimony has thus been waived. (*Simms*, 143 Ill. 2d at 170.) In an apparent attempt to avoid waiver, the defendant refers to the fact that he made a motion, prior to the start of the aggravation-mitigation phase, to "limit" evidence concerning the Doyle murder. However, this vague motion did not address Dr. Stein's testimony and thus did not dispel the defendant's obligation to object to testimony he considered improper, and to thereby give the trial court an opportunity to rule on the propriety of the testimony.

Even if this issue were not waived, we would find no error in the admission of the autopsy evidence. The standard for admissibility at a capital sentencing hearing is relevance and reliability. (*People v. Fair* (1994), 159 Ill. 2d 51, 89; *People v. Young* (1989), 128 Ill. 2d 1, 53.) The evaluation of relevancy and reliability is left to the sound discretion of the trial court. (*Fair*, 159 Ill. 2d at 89; *Young*, 128 Ill. 2d at 54.) Evidence of other crimes, even if they did not result in prosecution or conviction, is admissible if it is found to be sufficiently relevant and reliable. (*Young*, 128 Ill. 2d at 54; *People v. Owens* (1984), 102 Ill. 2d 88, 110.) When a prior conviction has been

proved, the prosecution may introduce evidence concerning the details of that offense, as long as that information is relevant and reliable. *Owens*, 102 Ill. 2d at 112.

Under these precedents, there was clearly no error in allowing the testimony regarding the autopsy on Officer Doyle. The defendant's conviction for the murder of Officer Doyle was proved at the eligibility phase of his sentencing hearing. Evidence regarding the details of that crime was therefore admissible, as long as it was relevant and reliable. (*Owens*, 102 Ill. 2d at 112.) The autopsy evidence satisfied both of those requirements. The injuries sustained by Officer Doyle were relevant to show the deliberate nature of the defendant's actions in killing him. Moreover, there is no contention by the defendant that the testimony of the medical examiner who performed the autopsy is not reliable evidence of the findings of that autopsy. This court has previously held that testimony regarding an autopsy of a crime victim and photographs of the autopsy are properly admitted at phase two of a death sentencing hearing (*People v. Rissley* (1995), 165 Ill. 2d 364, 404-05) and even at the guilt phase of a capital trial (*Peeples*, 155 Ill. 2d at 474; *Henderson*, 142 Ill. 2d at 319-20). The admission of Dr. Stein's testimony regarding the autopsy of Officer Doyle was not error.

### Evidence of Theft of Gun

The defendant also claims that testimony from Larry Garnett regarding the theft of his .38-caliber Llama revolver was improperly admitted at the aggravation-mitigation phase of his sentencing hearing. Garnett's stolen revolver was identified by a firearms expert as the weapon from which the bullet recovered from Officer Doyle's body was fired. The defendant claims that this testimony was improper because it suggested that the defendant had burglarized Garnett's home when there was no evidence that that was the

case. The record reveals that the defendant made no objection to Garnett's testimony concerning the theft of his gun. The issue of the admissibility of this particular evidence has thus been waived. (*Simms*, 143 Ill. 2d at 170.) Moreover, even if we were to consider this issue, we would find no abuse of discretion in the introduction of this evidence. The evidence was relevant because it showed that the gun used to kill Officer Doyle had been stolen and allowed the reasonable inference that the defendant had either stolen the gun or had, at least, been in possession of stolen property. Finally, the admission of this particular evidence cannot have had any effect on the outcome of the defendant's sentencing hearing. The evidence introduced in aggravation was so substantial that we are persuaded that, even without testimony suggesting that the defendant stole a gun, the verdict would have been the same. Any possible error in the admission of this evidence was therefore harmless beyond a reasonable doubt. See *Williams*, 164 Ill. 2d at 24.

### JURY INSTRUCTIONS AT SENTENCING

The defendant next contends that he was denied a fair sentencing hearing due to the trial court's refusal of three of the defendant's requested jury instructions. The first two of the requested instructions related to the jury's consideration of mitigating factors. The defendant asked the trial court to instruct the jury on a list of nonstatutory mitigating factors, and further asked the trial court to instruct the jury that "a juror may consider as evidence any mitigating factor even though all of the other jurors do not believe that the mitigating factor exists." The trial court refused both requests.

The defendant's arguments are without merit. With regard to the requested list of nonstatutory mitigating factors, the defendant acknowledges that this court has repeatedly held that it is not error for the trial court to refuse such a request, as long as the jury is instructed

that it should consider all potential mitigating circumstances. (See *People v. Gosier* (1991), 145 Ill. 2d 127, 159; *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 405-07.) Here, the trial court instructed the jury that "mitigating factors include any reason supported by the evidence why the defendant should not be sentenced to death." Under our previous cases, then, there was no error in refusing to specifically list nonstatutory mitigating factors. We see no reason to reconsider our long line of holdings on this issue.

The defendant claims that his requested instruction on the nonunanimity requirement for mitigating factors was mandated by the Supreme Court decisions in *Mills v. Maryland* (1988), 486 U.S. 367, 100 L. Ed. 2d 384, 108 S. Ct. 1860, and *McKoy v. North Carolina* (1990), 494 U.S. 433, 108 L. Ed. 2d 369, 110 S. Ct. 1227. A review of those decisions, however, reveals that both are clearly distinguishable. In *Mills*, the Supreme Court overturned a Maryland death sentence where the jury had received a verdict form which contained a list of possible mitigating circumstances, accompanied by spaces in which the jury could check "yes" or "no" and preceded by a statement that the jury "*unanimously* find[s] that each of the following mitigating circumstances which is marked 'yes' has been proven to exist." (Emphasis added.) (*Mills*, 486 U.S. at 384-89, 100 L. Ed. 2d at 400-03, 108 S. Ct. at 1870-72.) The verdict form in *Mills* further asked the jury to affirm or deny that it *unanimously* found that the mitigating circumstances marked "yes" outweighed the aggravating circumstances, and the trial court's instruction of the jury in that case emphasized the unanimity requirement. The *Mills* Court determined that these instructions and verdict form violated the Federal Constitution because the jury could have interpreted them as precluding the consideration of all possible mitigating evidence. *Mills*, 486 U.S. at 375, 100 L. Ed. 2d at 394, 108 S. Ct. at 1865-66.

In *McKoy*, the Supreme Court applied the *Mills* decision to overturn a North Carolina death sentence where the sentencing jury received an instruction which expressly prevented the jury from considering any mitigating factor that the jury did not "unanimously" find to exist. Following *Mills*, the *McKoy* Court held that the instruction violated the eighth amendment because it impermissibly limited the jurors' consideration of mitigating evidence. *McKoy*, 494 U.S. at 442-44, 108 L. Ed. 2d at 380-81, 110 S. Ct. at 1233-34.

In contrast to *Mills* and *McKoy*, the jury in the present case was instructed with regard to mitigation as follows:

> "If you unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to sentence the defendant to death.
>
> If you do not unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death."

Further, defense counsel argued to the jury during closing that "each of you has the power to give death, [and] each of you has the opportunity to give life."

We find that the instructions in this case did not, as in *Mills* or *McKoy*, convey the impression that unanimity was required before a mitigating factor could be considered in the balance. Rather, the instructions and argument in this case adequately informed the jury that unanimity was not required to find a mitigating factor sufficient to preclude death.

In *People v. Ramey* (1992), 152 Ill. 2d 41, 77, this court, considering a slightly different issue, discussed the crucial differences between the Maryland sentencing scheme invalidated in *Mills* and that existing in Illinois:

> "Unlike the Maryland statute construed in *Mills*, the

Illinois death penalty statute does not require the jury to reach unanimous agreement as to the *existence* of any mitigating factors before it can decide not to impose the death penalty. Rather, in Illinois, a sentencing jury is required to unanimously determine that mitigating factors sufficient to preclude the death penalty *do not exist* before that penalty can be imposed. In Illinois, unlike Maryland, the belief by one juror that any one mitigating factor sufficient to preclude the death penalty exists is sufficient to do so. As such, Illinois' death penalty procedure clearly provides for meaningful consideration of any and all mitigating factors." (Emphasis in original.) *Ramey*, 152 Ill. 2d at 77.

Accordingly, we conclude that the jury in this case was properly instructed regarding the consideration of mitigating factors. The instruction of the jury is a matter resting within the sound discretion of the trial court. (*People v. Cloutier* (1993), 156 Ill. 2d 483, 509.) The trial court acted well within its discretion in denying the defendant's request for an express instruction on the nonunanimity requirement for mitigating factors.

The defendant also claims error with regard to the trial court's refusal to give a third sentencing instruction requested by the defendant. The trial court instructed the jury that "[y]ou are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." The defendant requested that the court add a sentence to that instruction stating, "You may consider feelings of sympathy or mercy, if those feelings are based on mitigating factors." The trial court denied this request.

The defendant now contends that the trial court's denial of this additional language was error because the requested instruction was accurate and important to balance the "mere sympathy" language in the preceding language. We find no error in the trial court's ruling.

This court has held that, while mercy is a relevant factor for consideration at a capital sentencing hearing,

it is to be considered within the context of all factors in aggravation and mitigation. (*Simms*, 143 Ill. 2d at 182; *People v. Holman* (1984), 103 Ill. 2d 133, 170.) A separate mercy instruction need not be given as long as the jury is instructed that it should consider all circumstances that provide reasons for imposing a sentence other than death. (*Simms*, 143 Ill. 2d at 182-83.) This court has determined that, in such circumstances, "the jury is free to consider mercy or any other mitigating factor despite the absence of a specific instruction to do so." (*Simms*, 143 Ill. 2d at 183.) As noted, the jury here was instructed that it should consider as mitigation "any reason" why the defendant should not be sentenced to death. The trial court's refusal to expressly instruct the jury that it may consider mercy was thus not error.

Additionally, no error occurred with respect to the trial court's refusal of the sympathy prong of the defendant's requested instruction. This court has specifically approved the use, in capital sentencing proceedings, of the sympathy and prejudice instruction given by the trial court in this case. (*People v. Emerson* (1987), 122 Ill. 2d 411, 443.) This court has determined that jurors would understand this instruction to mean only that they should ignore the sort of sympathy that is totally divorced from the evidence, not that they should ignore sympathy that stems from the evidence presented. (*Emerson*, 122 Ill. 2d at 443, citing *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837.) We adhere to our previous determination that the sympathy and prejudice instruction given in this case adequately conveys to the jurors that they should ignore only that type of sympathy that is not based upon the evidence. A separate instruction directing the consideration of sympathy, such as that requested by the defendant, is not required. The trial court thus did not abuse its discretion in refusing to give the additional language specifically directing the jury to consider sympathy.

*Constitutionality of the Illinois Death Penalty*

Finally, the defendant raises a number of challenges to the constitutionality of the Illinois death penalty statute. This court has previously addressed, and rejected, each of the arguments now raised by the defendant. We decline to revisit the following arguments: that the statute is unconstitutional because it places a burden on the defendant which precludes meaningful consideration of mitigating evidence (*People v. Johnson* (1993), 154 Ill. 2d 356, 373; *People v. Bean* (1990), 137 Ill. 2d 65, 138); that the statute is unconstitutional because it allows the sentencer to weigh the "vague" aggravating factor of "any other reason" why the defendant should be sentenced to death (*People v. Orange* (1988), 121 Ill. 2d 364, 390-91; *People v. Young* (1989), 128 Ill. 2d 1, 59); that the statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences (*People v. Whitehead* (1987), 116 Ill. 2d 425, 465; *People v. Albanese* (1984), 104 Ill. 2d 504, 540-42). The defendant's challenges to the constitutionality of the Illinois death penalty statute are without merit.

## CONCLUSION

For the foregoing reasons, we affirm the defendant's convictions and death sentence. The clerk of this court is directed to enter an order setting Wednesday, January 10, 1996, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. The defendant is to be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Affirmed.*